[Crim. No. 6791. In Bank. July 20, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. BILLY WESLEY MONK, Defendant and Appellant.

Malcolm H. Mackey, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

WHITE, J.—In an amended information filed by the District Attorney of Los Angeles County defendant was accused in count I of the offense of kidnaping (Pen. Code, § 209) Rose Caroline Schaefer for the purpose of robbery, and subjecting her to bodily harm while defendant was armed with a deadly weapon, to wit, a 6-inch revolver. Count II charged defendant with robbing Miss Schaefer of a purse and $38 in money (Pen. Code, § 211). In count III defendant was accused of kidnaping (Pen. Code, § 209) Katherine A. Sorena for the purpose of robbery and subjecting her to bodily harm. Count IV alleged the crime of robbery (Pen. Code, § 211) in that defendant, by means of force and fear took from Mrs. Sorena a purse and $6.00 in money. By counts V and VI defendant was accused in the alternative with the crime of rape committed against Mrs. Sorena, in violation of subdivision 3 or, in the alternative, of subdivision 4 of Penal Code, section 261. Count VII charged a violation of section 288a upon the person of Mrs. Sorena. It was further alleged in the information that defendant had suffered a prior felony conviction for the crimes of forgery and burglary for which he had served a term of imprisonment in the state prison.

Defendant pleaded not guilty to all counts of the amended information, and not guilty by reason of insanity. He admitted the prior conviction charged against him.

Trial by jury was duly waived on all issues raised by both pleas, and the cause proceeded to trial before the court sitting without a jury. Defendant was adjudged guilty of the offenses charged in counts I, II, III, IV, VI and VII, and not guilty of the offense charged in count V.

As to counts I and III the court found that Miss Schaefer and Mrs. Sorena both suffered bodily harm and that at the time defendant committed the offense against Miss Schaefer he was armed with a deadly weapon. The court also found the robbery of Miss Schaefer charged in count II, and of Mrs. Sorena charged in count IV, to be robbery of the first degree.

The issue of defendant's sanity was submitted to the court on the reports of the two psychiatrists appointed by the court pursuant to the provisions of section 1027 of the Penal Code. The court found that at the time of the commission of the aforesaid offenses defendant was legally sane. Defendant's

motions to appoint a third psychiatrist and to permit him to present testimony of psychiatrist of his own selection were denied, but as will hereafter appear the court on motion for a new trial admitted into evidence a medical report from a psychiatrist who was obtained by defense counsel. Defendant's motion to reduce the death penalty to life imprisonment without possibility of parole and his motion for a new trial were also denied. Judgment of death in the manner prescribed by law was imposed for the offenses charged in counts I and III and judgment of imprisonment in the state prison for the terms prescribed by law was pronounced for the offenses alleged in counts II, IV, VI and VII. This appeal is automatically before us pursuant to the provisions of section 1239, subdivision (b), of the Penal Code.

As to the factual background surrounding this prosecution the record reveals that on March 14, 1960, Miss Rose Schaefer was returning to her home from a shopping center when defendant came up to her, pointed a gun at her, and said: "This is a stick-up. Make a sound and you're dead." He guided her with the gun a distance of 6 to 8 feet into a parking area where he asked her if she had a wallet. She indicated she did. He then forced her into an automobile, and as she entered he told her to throw her wallet into the back of the vehicle. She complied and never recovered the wallet which contained about $16 or more. Defendant drove the car while holding a gun against her. She said, "I want out of the car. You said this was a stick-up and you have my wallet. Let me out." He replied, "There is more to come. You use your imagination," and subsequently told her, "I want what you have between your legs." Shortly thereafter when defendant slowed the car down for a red traffic light Miss Shaefer threw herself out of the car, which was still moving, and received a number of cuts and bruises in the fall. She suffered from a loss of blood, was treated at a hospital, and was unable to return to work for about a week. Defendant had driven her about 5 or 6 miles before she escaped.

On April 19, 1960, defendant's second victim, Mrs. Katherine Sorena, was driving her automobile after nightfall accompanied by her 3-year-old son when she began to have trouble with the lights on her car. She got out of the vehicle to check the lights; defendant came over and after looking at the car told her he could not fix it. When she thanked him and said she would call her husband, he stated, "You and your boy want to get home safe? . . . Well, then, just

do as I tell you and you will be all right.'' She got back into her car and started it. Defendant got into his car and stayed bumper to bumper with her, with his lights turned up so that they blinded her. She got out of the car intending to make a telephone call, but defendant kept repeating in a threatening tone that if she wanted to get home safely to do as he told her. He guided them into his car and then drove in the direction of her home. When they were near her house he pressed a screwdriver against her back, continued driving, and told her to ''strip.'' She screamed and attempted to attract attention. He pulled her body close to him and repeatedly beat her about the face and pulled her hair. Her nose and jaw were broken, and blood began to pour from her face. He drove to a spot about 1-½ miles from her home and took her into a shack while threatening to kill her if she made a sound. Her son, who was crying, was with them. Defendant forced her to commit an act denounced by section 288a of the Penal Code, and she ''passed out.'' She was brought back to consciousness when he hurt her by putting his finger inside her vaginal cavity. She lost consciousness again, and when she came to he was having intercourse with her. Subsequently he led her and her son to the car while pressing a knife against her back. He drove them to a schoolyard where he let them out. On the way he asked her how much money she had, and she told him about six or seven dollars and said, ''Just take anything else I have, but please take me home.'' Defendant replied, ''All right. Just leave the purse where it is. When I am through with it, I will throw it back on your lawn.'' He still had the knife with him. She left the purse, which contained about six dollars, in the car because she was in fear.

Defendant's contention that the evidence is insufficient to support his conviction on the two counts of kidnaping for the purpose of robbery in violation of section 209 of the Penal Code is without merit.[1] With regard to count I, wherein Miss Schaefer was named as the victim, the evidence, as we have seen, discloses that defendant pointed a gun at her, told her ''This is a stick-up,'' and guided her with the gun a distance of 6 to 8 feet to his car where he directed her to

---

[1]Section 209 of the Penal Code provides in part: ''. . . any person who kidnaps or carries away any individual to commit robbery, . . . is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm. . . .''

throw her wallet into the rear of the vehicle. The cases hold that it is the fact, not the distance, of forcible removal which constitutes kidnaping in this state. (*People v. Wein,* 50 Cal.2d 383, 399-400 [326 P.2d 457] [victims forced to move from a few feet up to more than 50 feet]; *People v. Chessman,* 38 Cal.2d 166, 190-193 [238 P.2d 1001] [victim forced to move 22 feet]; *People v. Enriquez,* 190 Cal.App. 2d 481, 488 [11 Cal.Rptr. 889] [victim forced to move 6 feet].) The offense of kidnaping for the purpose of robbery was thus complete when defendant forced Miss Schaefer to walk several feet to his car. Moreover, it has been held that where a kidnaping occurs after the actual perpetration of a robbery such kidnaping may be kidnaping for the purpose of robbery if it may reasonably be inferred that the transportation of the victim was to effect the escape of the robber or to remove the victim to another place where he might less easily sound an alarm. (*People v. Kristy,* 4 Cal.2d 504, 507-508 [50 P.2d 798]; *People v. Randazzo,* 132 Cal.App.2d 20, 23-24 [281 P.2d 289].) In the instant case Miss Schaefer was near a shopping center when defendant accosted her, and it could reasonably be inferred by the trial court that he forced her to accompany him in his car in order to prevent her from turning in an immediate alarm.

 With reference to count III in which Mrs. Sorena was named as the victim, defendant argues that she voluntarily gave her purse to him and that his purpose was rape rather than robbery. He sets forth testimony by Mrs. Sorena at the preliminary hearing, which was admitted at the trial for impeachment purposes, to the effect that she had told defendant to take her money and leave her alone and that as far as she could remember she was the first one that told him he could take anything she had. On direct examination at the trial, however, Mrs. Sorena testified that defendant asked her how much she had, that she replied about six or seven dollars and told him, "Just take anything else I have, but please take me home," and he answered, "All right. Just leave the purse where it is. When I am through with it, I will throw it back on your lawn." In response to a question by the court as to who mentioned the word "purse" or "money" for the first time, Mrs. Sorena stated defendant asked her how much she had, and she further testified that it was after he asked her this question that she asked him where her purse was and that defendant told her it was on the car

floor and for her to leave it there. Whether Mrs. Sorena voluntarily gave her purse to defendant was a question of fact, and equally so was the question of whether she offered it to defendant because of the threatening means of force adopted by him. It was also a question of fact whether defendant kidnaped her for the purpose of robbery or for the sole purpose of committing sex crimes, and it is clear that the evidence supported the conclusion of the trial court that the kidnaping of Mrs. Sorena was for the purpose of robbery, among others.

There was ample evidence also that both victims suffered bodily harm. Mrs. Sorena was raped, stabbed, severely beaten, and subjected to a violation of section 288a of the Penal Code. Miss Schaefer suffered injuries when she jumped from defendant's car. Although defendant did not touch Miss Schaefer, it is apparent that his conduct in threatening her with serious bodily harm put her in fear and was the proximate cause of her jumping out of the automobile and of her consequent injuries. While no cases have been found involving kidnaping for the purpose of robbery where the bodily harm was not directly inflicted by the accused upon his victim, we are persuaded that the doctrine of proximate causation is applicable in a case such as the present one where the defendant's threats of bodily harm cause his victim to receive injuries in an attempt to escape therefrom.

 There is no merit in defendant's contention that section 209 of the Penal Code is so indefinite and uncertain that it is unconstitutional. (*People* v. *Wein, supra,* 50 Cal.2d 383, 400.)

 Defendant also contends that it was error to admit a confession into evidence, since, he argues, the police obtained it by means of force. Received into evidence were two tape recordings and their transcriptions in which defendant made various incriminating statements concerning the offenses against both victims. A police officer testified regarding another conversation with defendant in which he also made admissions concerning the offense against Miss Schaefer. Police officers testified that the various statements of defendant were free and voluntary. At the trial when evidence of the statements was admitted defendant made no objection on the ground that the statements were involuntary. Defendant did not testify at the trial on the issue raised by his plea of not guilty, and at the proceedings on the motion for a new trial defendant did not state, as indicated by defense counsel's

brief, that the scratch marks on his face were there because of force used by the police to obtain a confession. He merely testified that the marks were not on his face at the time of his arrest, that he remembered telling the police he had picked some blackheads when they asked him about the scratches, and that he was capable of inflicting marks on himself. The record does not support the assertion that the incriminating statements made by defendant were obtained by force, and the contention lacks substance here.

Defendant next asserts that the preponderance of the evidence showed that he was insane at the time he committed the acts charged and that a new trial should be granted as to the issue of insanity. ■■ On a trial of the issue raised by the plea of not guilty by reason of insanity, there is a rebuttable presumption that the defendant was sane at the time the crime was committed, and he has the burden of proving his insanity by a preponderance of the evidence. (*In re Dennis*, 51 Cal.2d 666, 673 [335 P.2d 657].) ■■ Reports by court-appointed psychiatrists Doctors Robert Wyers and James McGinnis were admitted into evidence. The former stated that defendant had a rather deep-seated personality disturbance and was rather paranoid in personality but that he did not consider defendant psychotic and that his studied opinion was that ''for legal purposes he [defendant] is sane and was sane at the time of the commission of the alleged offenses.'' The second doctor's report concluded that defendant was emotionally disordered with possibly a schizoid personality, or even possibly schizophrenia, but that defendant appeared to be legally sane at the time of the examination and ''considering the information supplied by the preliminary hearing transcript, to have been legally sane at the time of the commission of the alleged offense.'' Both medical reports indicated that defendant was hostile and that it was difficult to obtain information from him. Mrs. Monk testified that her husband underwent periodic spells of physical and sexual cruelty for which he would later apologize and that during these spells he would do other strange things such as burning his arms. During the proceedings on the motion for a new trial and for reduction of sentence the trial court admitted into evidence a third medical report by Dr. Ralph Elias, a psychiatrist obtained by defense counsel. The report stated that defendant was not afflicted at the time of the examination with any of the more florid manifestations of being insane, such as hallucinations or delusions, and that there was no his-

tory of his being so afflicted, but that his feelings of having been persecuted, possibly or probably justified, are pervasive. The report continued that defendant suffered from two types of episodic loss of consciousness or control, one of a *petit mal* nature and the other sadistic episodes, and that further studies should be made of this. While the evidence as to defendant's sanity at the time he committed the crimes charged against him may be regarded as conflicting, it cannot be said that it fails to support the finding that defendant was legally sane at the time he committed the crimes and at the time of trial, or that the conclusions drawn therefrom by the trial court are without legal justification.

Defendant next insists that because of his lack of education and his mental state, as evidenced by the psychiatrists' reports, he was unable to understand the consequences of waiving a jury trial. After defendant in response to questions by defense counsel stated he wished to waive his right to a jury trial, the trial judge explained to him in detail his right to a jury trial and what the effect would be if he waived that right. The judge then asked defendant if he fully understood. The latter's reply was, ''Could I lie and say 'yes'?'' The judge answered that he could not and permitted defendant to confer with his counsel. After doing so, defendant waived his right to a jury trial on the issues of guilt, insanity, and penalty. The judge again asked defendant if he understood what he was doing, and defendant replied ''Yes.'' Defense counsel and the prosecution joined in the waiver. As we have seen, the psychiatric reports showed that defendant was emotionally disordered but was legally sane. The reports also stated that defendant's native intelligence was adequate and that he stated he went to school to ''perhaps the tenth grade.'' In view of the foregoing we cannot agree with defendant's claim that he did not intelligently and knowingly waive a jury trial.

At his personal insistence to his present counsel, defendant urges that the public defender who represented him at the trial did not adequately or properly present the former's defense. In that regard, it is contended that the public defender refused counsel and advice to defendant as to whether or not he should waive a jury trial and left the decision up to defendant. As we have seen, the right to a jury trial was fully explained to defendant by the trial judge, and it is not alleged that the public defender refused to give a further explanation to defendant. Manifestly the final decision as to

whether to waive a jury trial is one which the defendant himself must make. He further asserts that the public defender refused to examine the court-appointed psychiatrists, to call witnesses the defendant requested, and to bring defendant transcripts of the court proceedings. The psychiatrists were not called as witnesses, but reports by them were introduced into evidence. Whether they should have been called and examined in court was a matter within the discretion of counsel. Defendant does not state the names of the additional witnesses whom he wished to call nor does he indicate what the nature of their testimony would have been. Therefore there is no basis for assuming that defense counsel did not exercise proper judgment in not calling additional witnesses. Defendant does not claim that he was desirous of becoming a witness in his own behalf or that he could have denied his guilt without committing perjury. The record discloses that transcripts of the trial proceedings were turned over to defendant prior to the rendition of judgment, and no authority has been found imposing upon defense counsel a duty to provide his client a daily transcript during the trial. It is thus apparent that there is no merit in defendant's claim that defense counsel was incompetent.

 Moreover, even if there had been any incompetency on the part of defense counsel, it is questionable whether defendant in the instant case could complain on appeal. A defendant may complain at any time during the trial that his counsel is not adequately representing him thereby affording the trial court an opportunity to correct the situation, but if a defendant fails to avail himself of this privilege at the trial level, he cannot ordinarily after an adverse judgment, first complain of the matter on appeal. (*People* v. *Prado,* 190 Cal.App.2d 374, 377 [12 Cal.Rptr. 141]; *People* v. *Comstock,* 147 Cal.App.2d 287, 299 [305 P.2d 228]; *People* v. *Hood,* 141 Cal.App.2d 585, 589-590 [297 P.2d 52].)

 Here defendant points out that he did bring the asserted incompetency of his counsel to the trial court's attention by making a motion to discharge the public defender who was representing him and stating that the latter had refused to defend him properly. The record discloses that this motion, although made prior to the rendition of judgment, was not made until after the trial court found defendant guilty of the various offenses, found him sane, and fixed the penalty at death on two counts. The motion was denied, but prior to ruling on various motions then pending the court

granted a motion by the public defender to be relieved and to be substituted for by present counsel who was permitted to present arguments on the motions. Under these circumstances we are not impressed that defendant's right to a fair trial was violated.

Defendant's final contention that this court reduce the penalty of death imposed by the trial court is unavailing. It is within the province of the trial court to determine the penalty. This court is without power to reduce the punishment in lieu of ordering a new trial unless the only error relates to the punishment imposed and the trier of fact has not been given exclusive discretion to determine the punishment. (*People* v. *Green,* 47 Cal.2d 209, 235 [302 P.2d 307]; *People* v. *Odle,* 37 Cal.2d 52, 57 et seq. [230 P.2d 345]) and where, as in the case now engaging our attention, there is an absence of error in the proceedings, we are not vested with authority to modify the judgment. (*People* v. *Odle, supra,* 37 Cal.2d 52, 57 et seq.)

Separate punishments for violations of section 209 of the Penal Code and for robbery and sex crimes that are essential parts of those violations would amount to double punishment, which is forbidden by section 654 of the Penal Code, but since defendant is subject to validly imposed death penalties, no purpose would be served by reversal of the other judgments of conviction. (*People* v. *Langdon,* 52 Cal.2d 425, 435 [341 P.2d 303]; *People* v. *Wein, supra,* 50 Cal.2d 383, 411.)

The judgment and order denying a new trial are and each is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and Dooling, J., concurred.

Appellant's petition for a rehearing was denied August 16, 1961.