[Crim. No. 14254.    Second Dist., Div. Five.    Feb. 21, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN WILLIAM REED, Defendant and Appellant.

Thomas R. Murphy, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Suzanne E. Graber, Deputy Attorney General, for Plaintiff and Respondent.

THE COURT.—Defendant, John William Reed, by an amended information was charged in three counts with murder (Pen. Code, § 187), kidnapping for the purpose of robbery with bodily harm, (Pen. Code § 209) and robbery (Pen. Code § 211). He was also charged with having been armed with a deadly weapon at the time of the offenses and with a prior felony conviction for violating section 10851 of the Vehicle Code, which he admitted.

Upon trial he was found guilty of all three counts as charged, the jury finding the murder and robbery to be in the first degree, and that the kidnapping for the purpose of robbery subjected the victim to bodily harm.

Defendant's motion for new trial was denied. Probation was denied and he was sentenced to the state prison for the term prescribed by law for the kidnapping conviction. Proceedings on the murder and robbery convictions were suspended until the judgment on the kidnapping becomes final. (*People* v. *Niles* (1964) 227 Cal.App.2d 749, 754-756 [39 Cal. Rptr. 11].)

Defendant has appealed from the judgment of conviction and from the order denying his motion for new trial.[1]

On appeal he contends that the trial judge committed prejudicial error in his instructions to the jury (1) by failing to give a cautionary instruction on defendant's extrajudicial oral admissions, (2) by giving a confusing and contradictory instruction defining ''malice'' and ''act attributable to defendant'' and (3) by giving an erroneous definition of ''bodily harm.''

The evidence presented to the jury was as follows:

At about 9:45 a.m. on November 29, 1966, Pamela Aleccia drove her car into the Standard Service Station at El Segundo and Western in the County of Los Angeles; the car was overheated. She stopped her car at the inside of the first set of gas pumps located at the west side of the station near Western Avenue. She observed two men talking in the station's office; one was a Caucasian dressed in a white uniform—the station attendant identified as Donald Hartman—and the other was the defendant dressed in a beige trench coat.

About one or two minutes later, Mr. Hartman walked over to Miss Aleccia's car while defendant stood in the door of the office. Defendant's hands were in the pockets of his trench

[1]The order denying the motion for new trial is not appealable and is therefore dismissed. (*People* v. *Ing* (1967) 65 Cal.2d 603, 614 [55 Cal. Rptr. 902, 422 P.2d 590]; Pen. Code, § 1237.)

coat. Miss Aleccia did not see any weapon. Mr. Hartman whispered to Miss Aleccia, who was seated in her car, "Would you please call the police? There is a man inside with a gun."

Mr. Hartman put water in Miss Aleccia's car. While he was doing this, Miss Aleccia got out of her car and started to walk toward the rear of her vehicle and toward the back of the station. She noticed that defendant was watching. She loudly asked where the telephone was located because she wanted to call work and tell them that she would be late. She did not know the location of the telephone at that particular time. Defendant, who was still standing in the doorway of the office, yelled out, "No," and kept shaking his head. His hands were still inside the pockets of the trench coat and looked as if they were clasped in front.

At this time, Miss Aleccia walked to the front of her car and talked again with Mr. Hartman who was still putting water into the car. At the same time, defendant was walking toward Miss Aleccia's car; he stopped a couple of feet from the driver's side. Miss Aleccia entered her car and drove from the station. Before leaving, she saw Mr. Hartman walk toward the office and away from the direction of defendant who remained where he was standing. She never saw a weapon in defendant's possession during the time she was at the station.

Miss Aleccia drove to a coffee shop and telephoned the police station. She remained at the coffee shop for another three or four minutes and talked with two men she met there. She and the men went and stood in front of the coffee shop. from that vantage point, Miss Aleccia observed Mr. Hartman and a customer in a green truck standing at the service islands of the Standard Station. She did not see defendant at that time.

A couple of minutes later, she drove in her vehicle to a Richfield Service Station located on Western Avenue across the street from the Standard Station in question. She left her vehicle and went to the rear of the station where a telephone booth was located. She observed defendant and Mr. Hartman talking in the office of the Standard Station; the man in the green truck had left.

About a minute later, she noticed a police vehicle driving south on Western; it made a left turn on El Segundo, went into the Standard Station and stopped at the gasoline pumps located at the north side of the station.

Deputy Sheriffs William G. Hill and John D. Riley were on

duty, in uniform, and driving in a sheriff's vehicle at approximately 9:30 a.m. on November 29, 1966. At approximately 9:50 a.m., they received a call on their vehicle's radio that a robbery was in progress at the Standard Station in question. Deputy Hill drove the vehicle to that location and as he approached the intersection there, the signal for making the left-hand turn was red; he hesitated at the intersection until he observed that it was clear to run the signal. While they were momentarily stopped, the officers saw defendant and Mr. Hartman in the office of the service station. Defendant was dressed in a tan trench coat and Mr. Hartman wore a white service station attendant's uniform with a white cap.

At this time, defendant and Mr. Hartman started to walk toward the rear of the office and went into the lubrication area of the service station. Defendant was walking a few inches behind Mr. Hartman. Neither Miss Aleccia nor Deputy Hill was able to see defendant's hands at that time; Deputy Riley was able to observe defendant's right hand and noticed that there was something in it but could not tell from that distance whether it was a gun. Defendant and Mr. Hartman proceeded through the lubrication area and across the parking lot toward a brown Plymouth sedan parked on the east portion of the lot. This automobile belonged to Mr. Hartman.

Deputy Hill slowed down the police vehicle near the office building of the station and Deputy Riley got out. He ran toward the south side of the service station and out of the sight of Deputy Hill. Deputy Riley stopped about 60 or 70 feet from the rear of Mr. Hartman's car. At this time, the officer observed Mr. Hartman seated in the driver's seat of his car and standing next to him was defendant with his hands at Mr. Hartman's thigh area; defendant had what appeared to the officer to be a gun in his hand.

At the same time, Deputy Hill was driving the police vehicle to the rear of the station; he also observed Mr. Hartman seated in his vehicle and saw defendant beginning to enter the rear of that car. Defendant's head, shoulders and both of his arms were inside the car. At this time, Deputy Riley could not see anything in defendant's hands, but Deputy Hill saw a gun in defendant's hand which was pointed toward the rear of the car.

Deputy Riley drew his gun, pointed it toward Mr. Hartman's vehicle, and shouted, in a loud voice, "Halt." Defendant removed his head from the interior of Mr. Hartman's car and looked in the officer's direction. The officer called to

defendant, in a loud, clear voice, "Put up your hands." Defendant shook his head in a negative manner and said something that sounded to Deputy Riley like, "no"; defendant attempted to withdraw his right hand from Mr. Hartman's car and at that time the officers could see that defendant was holding a gun in the inside of the car. Deputy Riley saw defendant start to point his gun in the officer's direction.

Meanwhile, Deputy Hill, who was driving around the gasoline pumps toward the rear of the station, saw defendant bring his body out of the car, and, with gun in hand, face in the direction in which he believed Deputy Riley to be. However, Deputy Hill could not see his partner.

Deputy Riley fired his first shot and defendant flinched as if he had been hit. Deputy Riley again ordered defendant to put up his hands. Defendant seemed to recover and again attempted to withdraw his arm from the interior of the vehicle and turn his gun in the officer's direction; Deputy Riley fired a second shot. Defendant turned both his hands, one of which still held the gun, away from Deputy Riley's direction and toward the direction of Mr. Hartman; Deputy Riley fired a third shot and defendant fell to the ground.

At the time that these events were taking place, Deputy Hill was stopping the police vehicle at a gasoline pump at the north end of the station. Upon seeing defendant point his gun at Mr. Hartman's head, Deputy Hill yelled to defendant to drop the gun. Defendant turned and looked at Deputy Hill and then held the gun toward Mr. Hartman's head; the officer was afraid that defendant would shoot Mr. Hartman and fired at defendant but did not hit him. Deputy Riley did not hear his partner's weapon being fired.

Deputy Riley checked defendant's person to ascertain whether he still possessed a weapon; Deputy Hill called an ambulance. Defendant had sustained wounds to his hand, chest, and arm. One of the shots fired by Deputy Riley fatally wounded Mr. Hartman.

As Deputy Hill checked defendant for other weapons, defendant told Deputy Hill that he didn't have any more weapons and said, "I should have shot him inside." A few minutes later defendant said to Deputies Hill and Riley, "why didn't you kill me, I would have killed you," and other language to that effect. He also used curse words.

Defendant's gun and some blood were found on the rear floorboard of Mr. Hartman's vehicle. The gun was fairly well covered with blood.

Three live rounds of ammunition were recovered from defendant's weapon. The first shell in the gun was so positioned that if the trigger had been pulled, there would have been a loaded chamber under the hammer. Deputy Hill saw four bullet marks in Mr. Hartman's vehicle, including a hole in the back window and another near the back window.

At the hospital where defendant was treated for his wounds, Deputy Sheriff Ray Roe recovered $8 from one of defendant's pants pockets and $44.09 from a pocket of his trench coat. The latter amount was established by the testimony to be the approximate sum missing from the office safe of the Standard Station in question. A credit card and foreign coin, but no American money, were found on Mr. Hartman's body.

The defendant did not testify and no witnesses were called in his behalf.

The defendant does not question the sufficiency of the evidence to sustain each of his convictions. He does question the applicability of the bodily harm instruction to the above facts as a matter of law.

1. ██ *Failure to give a cautionary instruction concerning defendant's extrajudicial declarations.*

The statements made by the defendant shortly after the shooting as related by the officers were: "[H]e didn't have any more weapons." "[H]e should have shot him inside." "I believe he told me the next time he would shoot him. I presume he was referring to the man in the white uniform." "He said why didn't we kill him, he would have killed us." "He just kept over and over. He would curse, use curse words, then say why didn't you kill me, I would have killed you, things like this, just ranting on like that."

Defendant is correct in his contention that a cautionary instruction should have been given, though not requested by him.[2] (*People* v. *Ford* (1964) 60 Cal.2d 772, 799 [36 Cal. Rptr. 620, 388 P.2d 892]; *People* v. *Deloney* (1953) 41 Cal.2d 832, 840 [264 P.2d 532]; *People* v. *Bemis* (1949) 33 Cal.2d 395 [202 P.2d 82].)

In the light of the uncontradicted evidence, however, the omission was not prejudicial. The victim had told Miss

[2]Section 2061, subdivision 4 of the Code of Civil Procedure was repealed effective January 1, 1967; but see Law Revision Commission Comment to Statutes of 1965, chapter 299, section 127, page 1366 to the effect that the repeal should have no effect on the decisional law requiring cautionary instructions.

Aleccia that defendant was armed. Both officers testified that they saw that defendant had a gun in his hand just prior to and during the shooting and was pointing it toward one of the officers and toward the victim. Defendant was apprehended at the scene of the shooting immediately after he was wounded in the hand, chest and arm, and his bloody gun was found on the rear floorboard of the car where he had been entering with the gun visible in his hand just before he was shot. The words he uttered added little to the malice he demonstrated at the scene of the robbery. In these circumstances it is highly improbable that the jury would have. returned a different verdict had the omission not occurred and he was not prejudiced by the failure to give the cautionary instruction. (*People* v. *Poindexter* (1958) 51 Cal.2d 142, 150-151 [330 P.2d 763] ; *People* v. *Riley* (1950) 35 Cal.2d 279, 286-287 [217 P.2d 625] ; *People* v. *Letourneau,* 34 Cal.2d 478, 492 [211 P.2d 865].)

2. ▮ *Did the trial judge commit prejudicial error in his instruction defining "malice" and "act attributable to defendant"?*

As the defendant has pointed out, he did not kill Mr. Hartman, nor did he fire his gun. The deputy sheriffs did all the shooting and one of them fired the fatal shot.

The court's instruction was :

"Murder is the unlawful killing of a human being, with malice aforethought.

"The word 'aforethought' means only that the intent must precede the act as distinguished from afterthought. 'Aforethought' does not imply deliberation or the lapse of considerable time.

"As used in connection with murder, 'malice' may be implied when the killing results from an act done by the defendant involving a high degree of probability that it will result in death, which act is intentionally done for a base, antisocial motive and with wanton disregard for human life.

"The term 'malice' does not necessarily imply a pre-existing hatred or enmity toward the person killed.

"As previously stated, the killing must result from an act done by the defendant. The killing results from an act done by the defendant if he, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and a police officer kills in reasonable response to such act."

Defendant concedes that malice may be established when a defendant initiates a gun battle, and under such circum-

stances he may be convicted of murder for a killing committed by another during such a battle. (*People* v. *Gilbert* (1965) 63 Cal.2d 690, 703-705 [47 Cal.Rptr. 909, 408 P.2d 365].) He contends, however, that the instruction was confusing in that it applied two different standards to the same act by the defendant. He acknowledges that the third paragraph correctly states the applicable law on malice (*People* v. *Conley* (1966) 64 Cal.2d 310, 320-322 [49 Cal.Rptr. 815, 411 P.2d 911], citing *People* v. *Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130], and *People* v. *Thomas* (1953) 41 Cal.2d 470, 480 [261 P.2d 1]; see also, *People* v. *Gilbert, supra*), but argues that the language in the last paragraph was contradictory to that in the third and thus stated the law in a confusing manner to the prejudice of the defendant's case. As he points out, whereas the portion of the instruction on malice refers to an act "involving a high degree of probability that it will result in death . . . intentionally done for a base, anti-social motive and with wanton disregard for human life," the portion which attributes the killing to the defendant refers to a killing which "results from an act done by the defendant if he, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and a police officer kills in reasonable response to such act."

Viewed in its entirety, however, the instruction seems clear. It states that murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187.) It defines the kind of act from which malice may be implied and it describes the kind of act which makes the defendant responsible for the killing even when done by another. Had the last part not been stated, the jury might have found that the defendant had the requisite state of mind to establish malice, but was not guilty of murder because the jury would have been uninstructed on the applicable law concerning his responsibility for a killing committed by another. Inasmuch as the killing here was committed by a police officer, it was proper for the court to instruct the jury on the law of *People* v. *Gilbert, supra,* under which such a killing may be attributed to the defendant, as well as to instruct on the rule, also explained in *Gilbert,* which imputes malice, apart from the felony-murder rule.

In this case the defendant pointed his gun toward one of the officers and toward the victim. Such aggressive actions required immediate reaction unless an officer is to be held to the unreasonable requirement that an armed robber be given the courtesy of the first shot. The officer's response was a

reasonable one to the defendant's act as defined in the last paragraph of the instruction, particularly in view of the consequences which may follow from failing to make such an immediate response, as demonstrated in *People* v. *Ford, supra,* 60 Cal.2d 772, 783-784, where an officer was shot down and killed because he wanted to give the defendant an opportunity to surrender his weapon and avoid bloodshed. Under these circumstances it may be said that defendant initiated the gunplay and the trial judge properly instructed the jury on the rules stated in the *Gilbert* case. The test for malice and the test for attributing responsibility were distinctly stated by the instruction and while they are worded differently their language is plain and each correctly states the applicable law for their respective elements of the offense.

Although the specific point is not made by counsel, we think that we should mention a problem closely associated with the one just discussed. The court gave the following instruction:

"All murder which is committed in the perpetration or attempt to perpetrate robbery is murder of the first degree."

This instruction sounds suspiciously like a felony-murder instruction, yet *Washington* and *Gilbert* tell us that the homicide here, whatever it was, was not felony murder. At first glance the giving of this instruction seems error similar to the one committed in *Gilbert.*

In *Gilbert,* the defendant had robbed a savings and loan institution. Weaver was his accomplice. Trying to make his getaway, Gilbert shot and killed Officer Davis. Gilbert and Weaver then fled the premises. As they were leaving Officer Nixon shot Weaver, who died from the wounds later that day.

As far as the killing of Weaver was concerned, the judgment was reversed. Although there was evidence of first degree murder because Weaver may have been killed in response to a shoot-out initiated by Gilbert, Officer Nixon's shot was not necessarily a response to Gilbert's initiation of gunplay, but may have been merely an attempt to prevent successful completion of the robbery. The instructions given made it unnecessary for the jury to determine which it was, because they told the jury that Gilbert could be convicted of murder for the death of Weaver without any proof of malice. We have inspected the record in *Gilbert.* It shows that there the jury was instructed in four different ways that if the killing was committed in the perpetration of robbery, it was

first degree murder, *whether it was intentional or accidental.* These instructions would have been correct, if Gilbert could have been convicted of felony murder as far as Weaver is concerned, but *Washington* says that he could not have been so convicted.

This is also true of defendant in the case at bar. He did not commit the killing and therefore was not guilty of felony murder. But here the jury was never told that defendant could be guilty of murder even though the killing was accidental. On the contrary the court was careful to distinguish between homicide and murder (CALJIC No. 300 [New]) and to define murder as "the unlawful killing of a human being, with malice aforethought." Thus when it spoke of "murder" in the instruction under discussion it was speaking of a homicide with malice.[3]

This question then remains: why, if this was not a felony murder, was it not error to instruct that "[a]ll murder which is committed in the perpetration or attempt to perpetrate robbery is *murder of the first degree*"? (Italics added.)

Here too, the answer is in *Gilbert.* Gilbert had a codefendant, one King, who was an accomplice and who, during the robbery waited for Gilbert and Weaver in a car. After holding that King, as an accomplice, could be convicted of any crime committed by Gilbert, the court continues: "When murder is established under Penal Code sections 187 and 188 pursuant to the principles defined above, section 189 may properly be invoked to determine the degree of that murder. Thus, even though malice aforethought may not be implied under section 189 to make a killing murder unless the defendant or his accomplice commits the killing in the perpetration of an inherently dangerous felony [citations omitted], when a murder is otherwise established, *section 189 may be invoked to determine its degree.*" (63 Cal.2d at p. 705 [Italics added].)

In other words, although a homicide committed neither by the defendant, nor by an accomplice, cannot be felony murder, if the victim is killed in the "perpetration or attempt to perpetrate . . . robbery . . ." (Pen. Code, § 189) and the

---

[3]In effect the trial court apparently heeded the criticism of the felony-murder doctrine as expressed in a comment on *Washington*: *California Rewrites Felony Murder Rule,* 18 Stan.L.Rev. 690. It is the author's thesis that *Washington* does not go far enough and that California case law has erroneously ignored the second word in section 189—"murder" —and replaced it by "killing." (See CALJIC No. 302-F [Revised].)

48

defendant is guilty of murder because of his "conscious disregard for life," then the murder will be of the first degree.

3. ■ *Was it proper to instruct the jury on "bodily harm" as provided by section 209 of the Penal Code and if so, was a correct instruction given?*

Defendant contends that the evidence did not warrant an instruction on "bodily harm" and further, that even if one had been warranted, the instruction should have required a decision that the bodily harm was a consequence of defendant's gratuitous aggravation of the completed crime of kidnaping of a threat of such aggravation, rather than that it was a reasonably foreseeable consequence of an act intentionally done by him.

Section 209 of the Penal Code provides that the defendant shall receive a greater penalty if the victim of a kidnapping for the purpose of robbery suffers bodily harm. The instruction given on this question was:

"If you should find the defendant guilty of the charge against him [under count II of the information] you must also find whether or not the person kidnaped [*sic*] suffered bodily harm in connection with or as a result of the commission of this charge from an act done by the defendant, and state your decision in that respect in your verdict.

" 'Bodily harm,' as that term is used in this instruction, means substantial bodily injury or death to the body of·a person who is the victim of such kidnaping [*sic*] by the application of physical force above and in addition to the force which is necessarily involved in the commission of such kidnaping [*sic*].

"As previously stated, the bodily harm must occur in connection with or as a result of an act done by the defendant in the commission of kidnapping to commit robbery. For purposes of the kidnapping to commit robbery charge the bodily injury occurs in connection with or as a result of an act done by the defendant if such injury is reasonably forseeable [*sic*] from an act intentionally done by the defendant, irrespective of whether the defendant personally inflicted such injury."

In *People* v. *Monk* (1961) 56 Cal.2d 288, 296 [14 Cal.Rptr. 633, 363 P.2d 865], the court held that the doctrine of proximate causation is applicable to determine whether the victim has suffered bodily harm within the terms of the statute. In that case the defendant was driving his kidnap victim in a car with a gun against her while threatening bodily harm and she injured herself when she threw herself out of the moving car

to make her escape. The court held that his threatening con-; duct put her in fear and was the proximate cause of her injuries.

Defendant relies on *People* v. *Baker* (1964) 231 Cal.App.2d 301 [41 Cal.Rptr. 696, 11 A.L.R.3d 1046] and *People* v. *Jack-son* (1955) 44 Cal.2d 511, 515-517 [282 P.2d 898], to support his contentions that as a matter of law the type of bodily harm suffered by the victim, Mr. Hartman, is not the type intended to be included in the statute. He further argues that in any event the jury should have been instructed in the language of the *Baker* case that the harm meant must be the consequence of a gratuitous threat or abuse aggravating an already completed crime. The holding in *Jackson*, however, referred to the quality or extent of the injury necessary to a finding of bodily harm and not to its cause, which is a separate and distinct concept from the one with which the court dealt in *People* v. *Monk, supra.* In *Jackson* the victim's wrists were bound tightly by chains and were loosened by his captors when he complained that the chains were tight. There was no break in the skin, but there had been some impairment of circulation and some little marks similar to those made by a wristwatch band. There the court held as a matter of law that the victim suffered no bodily harm. (*People* v. *Gilbert, supra*, 63 Cal.2d 690, 711.) In our view, the above second paragraph of the instruction given by the trial judge in this case cor-rectly stated the law of the *Jackson* case with respect to the quality of injury needed to find bodily harm.

On the question of causation the facts here do not warrant the application of the language in *People* v. *Baker, supra.* The court there, found that the self-inflicted injury suffered by the victim when he jumped from a moving truck to escape his kidnapper ''was not the result of any intentional gratuitous aggravation of the completed crime by the kidnaper [*sic*], nor was it suffered as a consequence of an actual threat of gra-tuitous aggravation of the completed crime. . . .'' (231 Cal. App.2d at p. 306.) While the concern of the court there was with causation, the language in that opinion does not justify departure from *Monk's* application of the doctrine of proxi-mate causation in the manner urged by the defendant here. (See *People* v. *Washington, supra*, 62 Cal.2d 777, 778, fn. 3.) In *Baker* the court acknowledged that if the injuries ''had been inflicted directly or proximately caused by appellant by threats or bodily harm as in *Monk, supra*, instead of self-inflicted as a result of the victim's attempt to escape, such

injuries could be considered a gratuitous aggravation of a completed crime. . . .'' (231 Cal.App.2d at p. 306.)

The bodily harm here was the proximate result of defendant's gratuitous initiation of a gun battle. The injury was a reasonably foreseeable consequence of defendant's menacing gestures with his gun. It was not self-inflicted as in *Baker* and it was not the result of an independent intervening cause. (See *People* v. *Gilbert, supra,* 63 Cal.2d 690, 705.) Under these facts the court correctly applied the rule of the *Monk* case in the last paragraph of the instruction by requiring a finding that reasonable foreseeability of the risk of defendant's intentional act establishes defendant's responsibility for the resultant bodily harm. We find no error in the court's instructions to the jury.

After the jury had been discharged, the prosecutor announced that the People would not seek the death penalty. Then there followed somewhat confused proceedings, in which it was stipulated that the determination as to punishment could be made by the court at the time of sentence, although the court actually did fix the punishment on count I at life imprisonment on the day the verdicts were returned. No further express determination was made at the time of sentence except the one implicit in sentencing defendant to state prison on count II. The court then misapplied the procedure approved in *People* v. *Niles,* 227 Cal.App.2d 749, 754-756 [39 Cal.Rptr. 11], and did not even pronounce judgment on counts I and III. Instead, the record shows, all proceedings, not just the execution of sentence, were suspended until the judgment on count II became final. Fortunately, however, the error is academic, since we affirm the judgment on the count on which defendant was sentenced. Under such circumstances any remand to the trial court would be futile. (See *People* v. *Jenkins,* 231 Cal.App.2d 928, 934-935 [42 Cal.Rptr. 373].)

The judgment is affirmed. The appeal from the order denying motion for new trial is dismissed.

A petition for a rehearing was denied March 7, 1969, and appellant's petition for a hearing by the Supreme Court was denied April 17, 1969.