[Crim. No. 20130. Second Dist., Div. Four. Sept. 19, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
HAMMOND CLEVELAND, Defendant and Appellant.

## COUNSEL

Richard S. Buckley, Public Defender, James L. McCormick, Seymour Weisberg and Dennis A. Fischer, Deputy Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Russell Iungerich and William R. Pounders, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KINGSLEY, J.**—Originally, defendant was charged as follows: (count I) kidnaping, in violation of section 207 of the Penal Code; (count II) kidnaping for the purpose of robbery, in violation of section 209 of the Penal Code; (count III) robbery, in violation of section 211 of the Penal Code; (count IV) assault with intent to commit murder, in violation of section 217 of the Penal Code; (count V) grand theft in violation of section 487, subdivision 3, of the Penal Code; (count VI) violation of section 10851 of the Vehicle Code. By amendment, defendant was charged with a prior felony conviction (Pen. Code, § 496). Criminal proceedings were suspended after defendant was examined by two psychiatrists, because the court declared doubt as to defendant's sanity. After a certification of sanity was received by the court, Doctors Tweed and Davis were then appointed to examine defendant in regard to his sanity, and the court found defendant able to stand trial. A plea of not guilty by reason of insanity was entered; Dr. Bielinski was appointed to examine defendant's sanity. Count I was dismissed.[1]

---

[1] As a result of that action, the remaining counts were renumbered, so that the original count II became count I, and the other counts were renumbered accordingly. Subsequent proceedings, and references hereinafter in this opinion, refer to the renumbered counts.

Criminal proceedings were again suspended due to present insanity. After a further report, the court found defendant presently sane. Trial by jury was had; defendant was found guilty of kidnaping for robbery where the victim was subjected to bodily harm. Defendant was found guilty of counts II-V, and he was found armed during the commission of count II. A sanity hearing was held, defendant was found sane during the commission of offenses charged in counts I, II and IV and insane during the commission of offense charged in count III. The jury determined the penalty for kidnaping for purpose of robbery to be life imprisonment without possibility of parole.

Mr. Givhan, the victim, was returning from a friend's house, when he saw a woman sitting in a car with the hood up. She was waving her hands and he stopped to help. He asked what the trouble was and two men, one of whom was defendant, "appeared out of nowhere." Mr. Givhan gave them all a lift and during the trip defendant and the others were friendly. The men got out of the car, and defendant put a gun to Givhan's head. Mr. Givhan was ordered out of the car and told to take off his shoes and socks and to give defendant his wallet. Twice defendant said Givhan "was as good as dead." Defendant ordered Givhan into the trunk of the car, and Givhan heard the woman reading his name and address. While Givhan was in the trunk, they drove around for one-half hour. Then they raised the trunk and Givhan saw that they were in front of his apartment building. They closed the trunk and returned an hour later. Defendant was then wearing Givhan's clothes. They stopped for gas and Givhan tried to make noise. They drove for about another hour and Givhan heard defendant tell the woman that defendant wanted to beat Givhan to death with the jack. The woman said that beating Givhan to death would not kill him instantly, so she suggested shooting him instead. Mr. Givhan removed a tail light hoping to draw attention to the vehicle. Defendant opened the car in a desolate area and told Givhan to walk up the hill. Givhan's bare feet were cut by broken glass and sticks. Defendant shot Givhan two times in the back, then defendant stood over him and shot him in the wrist, below the ear, and in the left side. Defendant walked off and Givhan lay there for about an hour. Givhan crawled off, and a woman in a passing car called an ambulance. The defendant was found and arrested; the victim survived.

During the sanity phase of the trial, several psychiatrists testified. Dr. Tweed testified that defendant was mentally ill and that, due to an excessive benzedrine intake, defendant had a paranoid schizophrenic reaction. Dr. Tweed testified that defendant was legally insane in that he was incapable of knowing the nature of his act or defendant had a condition which made him incapable of knowing that his act was wrong.

Dr. Davis testified that defendant had symptoms suggesting paranoid schizophrenia and that defendant was insane at the time of the offenses and that he didn't understand the quality of his act. Dr. Davis said defendant was "in partial remission and had improved."

Dr. Bielinski testified that defendant was not schizoid and that defendant knew what he was doing at the time he did it, and that at the time of the commission of the act, defendant knew right from wrong.

Dr. Walters testified that, based on his personal interview with defendant, defendant knew the nature and quality of his act, and he knew his act was wrong, and defendant was not schizophrenic. Defendant had a character disorder.

Dr. Owre testified that defendant was simulating paranoid thinking and that defendant was merely malingering in order to be a patient instead of a prisoner.

Dr. Abe and defendant's cousin, Mrs. Warmsley, testified for the defendant on the sanity issue.

Of the doctors who testified, Drs. Walters and Owre were retained by the prosecution. The other doctors, we are advised, were court-appointed.

## I

■ Defendant argues that he was improperly convicted of kidnaping to commit robbery (Pen. Code, § 209).

Defendant first argues that the *Daniels* instruction was error in the light of the Supreme Court decision in *People* v. *Timmons* (1971) 4 Cal.3d 411 [93 Cal.Rptr. 736, 482 P.2d 648], and in the light of the intervening burglary of the victim's residence. In *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1139 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], the court held that the intent of the Legislature in 1931, when it amended Penal Code section 209, was to exclude from the statute coverage of those robberies "in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself." The jury in the case at bench was instructed on Penal Code section 209 in light of the *Daniels* decision. In the subsequent decision of *People* v. *Timmons* (1971) *supra*, 4 Cal.3d 411, 414, the court elaborated on the test for a violation of Penal Code section 209, stating that the proper test for conviction under section 209 requires that the movement substantially increases the risk of physical harm over and above those to which a victim of the underlying crime is normally exposed. A slight increase in the risk of harm beyond that inherent in the commission of the robbery is insufficient for a violation of Penal Code section 209. The *Timmons* court held that a 5-block asportation where the police were not in hot pursuit, there was no high speed chase, and where the defendant had no weapon and

neither victim suffered harm did not amount to a violation of Penal Code section 209. There was no error below in giving the *Daniels* instruction on Penal Code section 209 since the jury was instructed that the increase in the risk of harm must be substantial. *Timmons* merely elaborated on and explained the test of *Daniels*. *Timmons* did not change the *Daniels* rule.

Defendant also appears to argue that the holding in *Timmons* precludes a finding of guilt below. *Timmons* is to be distinguished from the case at bench, since in *Timmons* there was no use of weapons and no danger to the victim in the 5-block asportation, and in the case at bench there was a substantial increase in the risk of harm during the asportation. Defendant argues that where the victim is moved to his own house, as opposed to a place of temporary safety, as in *In re Bryant* (1971) 19 Cal.App.3d 933 [97 Cal.Rptr. 40], or to a more secluded spot, as in *People* v. *Rocco* (1971) 21 Cal.App.3d 96 [98 Cal.Rptr. 365], the risk of harm is not substantially increased and in fact the victim is more likely to get help at his own house from a milkman or neighbor. We do not agree that the risk of harm is not substantially increased. Although it was true that the victim may have gotten help at his house, it is also true that the additional one-half hour asportation, with weapons in defendant's possession, and under threats that the victim was "as good as dead," substantially increased the risk of harm to the victim. Again, this is to be distinguished from *Timmons* where the victim was not threatened and there were no weapons. The mere possibility that a victim may get help during the asportation does not negate the increase in the risk of harm that an otherwise dangerous type of asportation may create.

Defendant argues that the intervening burglary of the victim's home precludes a finding that the kidnaping was to commit robbery in violation of Penal Code section 209, and also that the jury was not properly instructed on the effect of that intervening burglary. The jury was instructed on the definition of kidnaping for the purpose of robbery, and the jury was instructed that simple kidnaping was a lesser included offense to kidnaping for the purpose of robbery. The jury was instructed that if they had a reasonable doubt as to the purpose of the movement, they could find defendant guilty of only simple kidnaping. That instruction dealing with a reasonable doubt as to the purpose of the movement, read together with the other instructions, properly permitted the jury to consider the effect of the intervening burglary. That is, the instruction in effect told the jury that if they had a reasonable doubt that the purpose of the movement was to commit robbery, in that the movement was related to the burglary,

the jury could only find defendant guilty of simple kidnaping and not guilty of Penal Code section 209.[2] The instructions were sufficient.

Defendant's argument that the intervening burglary precludes a finding that defendant is guilty of Penal Code section 209 is also without merit. A simple abduction may have multiple purposes, one of which is the commission of robbery. (See *People* v. *Daniels* (1969) *supra,* 71 Cal.2d 1119, 1136-1137.) If one of the purposes of the movement in the case at bench was to escape from the intervening burglary, this would not preclude a conviction for Penal Code section 209, if an additional purpose of that same movement was to commit robbery.[3]

## II

Defendant alleges that the giving of the so-called *Monk* instruction was improper. The jury was told that "where the kidnaping takes place after the actual perpetration of a robbery, such kidnaping *would* be a kidnaping for the purpose of robbery if it may reasonably be inferred that the transportation of the victim of the kidnaping was to effect the escape of the robber or robbers or to remove the victim of the kidnaping to another place where said victim might less easily sound an alarm, or be delayed in sounding an alarm. However, the court admonishes you that all *elements* of any crime must be proved beyond a reasonable doubt." (Italics added by defendant.) (See *People* v. *Monk* (1961) 56 Cal.2d 288, 295 [14 Cal.Rptr. 633, 363 P.2d 865].)

Defendant's first objection is that this instruction did not explain that there must be a substantial increase in the "risk of harm" within the meaning of *Daniels*. Although the jury was not instructed in this particular instruction that there must be a "substantial increase in the risk of harm," and although we agree with defendant that this principle applies to movements which follow the robbery, the jury was instructed elsewhere in another instruction that they must find that the movement must substantially

---

[2]Similar instructions were found sufficient to insure that the jury would not find defendant guilty of kidnaping for the purpose of robbery unless they found that the intent to rob the victim motivated the kidnaping. See *People* v. *Smith* (1971) 22 Cal.App.3d 197, 201-202 [99 Cal.Rptr. 192], which did not involve an intervening burglary. Defendant argues with some merit that the *Smith* case, cited by the People, has no application here. However, we need not rely on *Smith* to reach the conclusion that the instructions were sufficient.

[3]The prosecutor during argument stated to the jury as follows: "If the movement is made solely to avoid detection for burglary, then it would not be kidnaping for the purpose of robbery. But if it was done for both purposes, it would be a kidnaping for the purposes of robbery. That is an important concept to remember."

increase the risk of harm. Since instructions are to be read as a whole, there was no error.

Defendant also objects that the above instruction incorrectly refers to the underlying crime as kidnaping and not robbery. Since there was both a kidnaping and a robbery, the question as to which crime is the "underlying crime," in the particular context of this instruction, is an abstraction without significance.

Defendant further objects that the instruction invited the jury to find a violation of section 209 by drawing a "reasonable inference" to the purpose of the abduction rather than requiring that the jury use the proper "reasonable doubt" standard. Since the jury was admonished within the particular instruction of which defendant complains that "all elements of any crime must be proved beyond a reasonable doubt" any confusion that may have existed as to what the proper standard was would have been clarified.

Defendant also attacks the use of the word "would" rather than "may" as being inconsistent with the wording of *People* v. *Monk* (1961) *supra,* 56 Cal.2d 288, 295. The challenged phrase is "such kidnaping would be a kidnaping for the purpose of robbery if it may be reasonably inferred that the transportation of the kidnaping was to effect the escape . . . ." Although *Monk* did use "may" rather than "would," the change of words is not prejudicial. If the jury makes the inference that the transportation of the victim was to facilitate the escape of the robber or to remove the victim to another place where he might less easily sound an alarm (read with the *Daniels* instruction), the kidnaping is a kidnaping for the purpose of robbery. Therefore, there was no reversible error in the use of the word "would."

Finally, defendant asserts that *Monk* does not correctly state the law today in view of the construction of section 209 rejected by *Daniels.* Assuming without deciding that *Monk* without the *Daniels* modification no longer states the law (see *People* v. *Mutch* (1971) 4 Cal.3d 389 at p. 393 [93 Cal.Rptr. 721, 482 P.2d 633]), since the jury was also instructed in terms of *Daniels,* and since instructions are to be read as a whole, there would be no prejudicial error in instructing in terms of *Monk.* The *Daniels* instruction, when read as modifying the *Monk* instruction, would sufficiently clarify *Monk* to include in *Monk* the "substantial increase in the risk of harm" test.

### III

Defendant alleges that the record is devoid of substantial evidence

to support the jury's findings that defendant was sane at the time of the commission of the offenses in counts I, II, and IV. Defendant alleges that the testimony of Dr. Bielinski was incompetent because he misunderstood the California law of criminal responsibility. Defendant points to Dr. Bielinski's statement that a person could not fully appreciate the nature and consequences of his actions, but yet could know that what he was doing was wrong. The doctor said that a person may be "inferentially aware" but not "competently aware." Since Dr. Bielenski also testified that appellant knew what he was doing at the time he did it, and that he could distinguish between right and wrong, and that he understood the nature and quality of his act, there is nothing to support defendant's contention that Dr. Bielinski did not understand the McNaughton test of sanity.

Defendant objects to Dr. Walters' testimony as incompetent because Dr. Walters failed to make a written report of his examination, thus denying defendant the right to effective cross-examination. Although it would have been better practice to reduce the report to writing, no rule requires the psychiatrists to prepare a written report. And even if this were error, such error would go to the weight of the expert's testimony. (*People* v. *Bassett* (1968) 69 Cal.2d 122, 146, fn. 22 [70 Cal.Rptr. 193, 443 P.2d 777].)

Defendant objects that Dr. Owre's testimony that defendant was a malingerer rather than a paranoid schizophrenic, does not support the verdict. Dr. Owre's testimony was competent and supports the verdict. Acceptance or rejection of that testimony was for the trier of fact.

Defendant relies on *People* v. *Bassett* (1968) *supra,* 69 Cal.2d 122, to support his argument that the testimony of the prosecution psychiatrists was insufficient to support the jury's verdict that defendant was sane at the time of the commission of certain counts. In *Bassett* the testimony of two prosecution psychiatrists was not substantial where neither of the prosecution psychiatrists examined defendant in person and the four defense psychiatrists examined defendant in person. *Bassett* is clearly distinguishable. The testimony of the three psychiatrists for the prosecution in the case at bench, all of whom personally examined the defendant, was more than sufficient to establish defendant's sanity during the commission of the offenses in counts I, II, and IV.

## IV

Defendant alleges that he may not be subjected to aggravated punishment under Penal Code section 209, for infliction of bodily harm on the victim when he was insane at the time the bodily harm occurred,

and the judgment should be modified to eliminate ineligibility for parole. The aggravated punishment imposed on defendant was not imposed for the assault, which was committed while defendant was insane, but was imposed for a violation of Penal Code section 209; that is, the aggravated punishment was imposed for the kidnaping for the purpose of robbery with bodily harm. Although defendant was found to be insane at the time the bodily harm was inflicted, he was found to be sane at the time of the kidnaping for the purpose of the robbery.

Section 209 of the Penal Code reads in pertinent part as follows: "Any person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever with intent to hold or detain, or who holds or detains, such individual for ransom, reward or to commit extortion or to exact from relatives or friends of such person any money or valuable thing, or any person who kidnaps or carries away any individual to commit robbery, or any person who aids or abets any such act, is guilty of a felony and upon conviction thereof shall suffer death or shall be punished by imprisonment in the state prison for life without possibility of parole, at the discretion of the jury trying the same, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm or shall be punished by imprisonment in the state prison for life with possibility of parole in cases where such person or persons do not suffer bodily harm." It will be noted that the section nowhere indicates that the bodily harm suffered by the victim must have been inflicted intentionally. Thus the increased penalty of section 209 has been held applicable where the victim was injured in gun play between the kidnaper and police. (*People v. Dacy* (1970) 5 Cal.App.3d 216, 220-221 [85 Cal.Rptr. 57]; *People v. Reed* (1969) 270 Cal.App.2d 37, 50 [75 Cal.Rptr. 430].) In *People v. Monk* (1961) *supra,* 56 Cal.2d 288, 296, the Supreme Court applied the increased penalty where the harm was suffered in the course of the victim's attempt to escape. Even accepting the limitation on *Monk* expressed by division two of this court in *People v. Baker* (1964) 231 Cal.App.2d 301 [41 Cal.Rptr. 696, 11 A.L.R.3d 1046], the injuries here went far beyond the "injuries inherent in a forcible kidnaping" which *Baker* involved. In short, when serious injuries are inflicted during the course of a kidnaping and are not the result of some extraneous independent intervening cause, the increased penalty of section 209 is proper. Thus, since defendant below was sane at the time he committed the kidnaping to commit robbery, he is legally responsible for the harm to the victim.

## V

Defendant alleges that the aggravated punishment for an offense committed while defendant was legally insane offends the constitutional prohibition against cruel and unusual punishment. Defendant analogizes to the case of *Robinson* v. *California* (1962) 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417], which held unconstitutional a code section declaring a narcotics addict to be guilty of a crime. The court reasoned that addiction is a sickness and should not be punished. Defendant argues that an insane person is just as sick as a narcotics addict and therefore punishment for insanity is also unconstitutional. The analogy is without merit. Defendant is not being punished for the *state* of being insane. He is being punished for the act of kidnaping—an act committed while he was sane. As we have said above, the law does not require a separate criminal intent to harm where the harm is incident to the kidnaping.

## VI

Defendant also alleges that the sentence of life without possibility of parole violates the constitutional provisions against cruel and unusual punishments. Assuming, without deciding, that California's aggravated kidnaping statute needs revision (William Enright, *California's Aggravated Kidnaping Statute—A Need for Revision* (1967) 4 San Diego L.Rev. 284, 309), that is a matter for the Legislature and not for the court. In fact, in its implementation of *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], the Supreme Court (modified fn. 45, p. 657) expressly provided for the substitution of life without possibility of parole for the death penalty in cases where the statutes authorized that alternative.

## VII

When defendant was arraigned for sentencing, the trial court made an express finding that he was "sane for the purpose of sentencing." It then proceeded to impose sentence on counts I, II and IV, but made no reference to count III.[4] Section 1026 of the Penal Code provides, in pertinent part, as follows:

---

[4]"Whereas the said defendant having been duly found guilty in this court of the crime of KIDNAPPING FOR THE PURPOSE OF ROBBERY (Sec. 209 PC), a felony, as charged in Count 1 of the information as amended, and the Jury having found that Thomas S. Givhan was subjected to bodily harm and fixed the penalty at life imprisonment without possibility of parole; ROBBERY (Sec. 211 PC), a felony, as charged in Count 2, which the Jury found to be Robbery of the first degree, and that at the time

"If the verdict or finding be that the defendant was insane at the time the offense was committed, the court unless it shall appear to the court that the defendant has fully recovered his sanity shall direct that the defendant be confined in the state hospital for the criminal insane. . . . If, however, it shall appear to the court that the defendant has fully recovered his sanity such defendant shall be remanded to the custody of the sheriff until his sanity shall have been finally determined in the manner prescribed by law." Clearly those provisions were not complied with. The finding that defendant was "sane for the purpose of sentencing," is not the equivalent of a finding that it appeared to the trial court that he had "fully recovered his sanity." Sanity for the purpose of sentencing requires only that a defendant appreciate what is going on and be able to participate in the sentencing process, whereas a finding that he has recovered sanity in the sense of sections 1026 and 1026a is " 'that the person has improved to such an extent that he is no longer a menace to the health and safety of others.' " (*In re Jones* (1968) 260 Cal.App.2d 906, 911-912 [68 Cal.Rptr. 32].) It follows that the case must be remanded for a proper disposition of count III.

If the trial court should find that defendant has fully recovered his sanity in the sense of *Jones,* and a hearing sustains that finding, then a resentencing in the form used will become proper. However, if the trial court does not make such a finding, or if the hearing determines that he has not recovered, a dilemma will arise. Section 1026 requires that the defendant be committed on count III to the state hospital for the criminally insane, whereas other statutes require that he be sentenced to state prison on counts I, II and IV. Obviously he cannot be confined in two places at once. Since the purpose of the confinement under sections 1026 and 1026a is to protect society and to afford an opportunity for psychiatric treatment, and since the Department of Corrections has facilities

of the commission of said offense, Sections 3024 and 12022 Penal Code were inapplicable, but defendant was armed within the meaning of Section 1203 Penal Code and GRAND THEFT (Auto) (Sec. 487.3 PC), a felony, as charged in Count 4; admitted prior conviction as alleged, to wit: Violation of Section 496, Penal Code, a felony, Superior Court of the State of California, Los Angeles County, January 11, 1968.

"It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the State Prison for the term of his natural life without possibility of parole, as to Count 1 and for the term prescribed by law, as to Counts 2 and 4.

"Sentences as to Counts 1, 2 and 4 are ordered to run CONCURRENTLY with each other.

"It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles, to be by him delivered into the custody of the Director of Corrections at the California State Prison at Chino."

that can be utilized for both purposes,[5] we conclude that, in the eventuality under consideration, it would serve the purposes of all the statutes if the confinement, under all counts, were in the state prison.

The judgment and sentence are vacated; the case is remanded to the trial court with directions to rearraign defendant for sentence and thereafter to proceed in accordance with this opinion.

Files, P. J., and Jefferson, J., concurred.

On October 6, 1972, the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied November 15, 1972.

---

[5]Penal Code section 6100 provides: "There is hereby established an institution under the jurisdiction of the Department of Corrections to be known as the Medical Facility."

Penal Code section 6101 provides: "The Medical Facility shall be located in the northern part of the State."

Penal Code section 6102 provides: "The primary purpose of the Medical Facility shall be the receiving, segregation, confinement, treatment and care of males under the custody of the Department of Corrections or any agency thereof who are either:

"1. Mentally ill, or

"2. Mentally defective, or

"3. Epileptic, or

"4. Addicted to the use of narcotics, or

"5. Otherwise physically or mentally abnormal, including but not limited to psychopaths and sex offenders, or

"6. Suffering from any chronic disease or condition."