Filed 5/7/21  P. v. Yang CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B296271 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA116747) |
| v. | |
| WEI YANG, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County.  David C. Brougham, Judge.  Affirmed with conditional remand.

Eric S. Multhaup for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Appellant Wei Yang was convicted of kidnapping for robbery and making a criminal threat against his business associate Dong Dong Chang. (Pen. Code, §§ 209, 422.)[1] The trial court sentenced appellant to life in prison for the kidnapping conviction and stayed sentence on the criminal threats conviction pursuant to section 654.

Appellant did not testify at trial or present other live witnesses. He appeals from the judgment of conviction, contending the trial court erred in denying his *Batson/Wheeler*[2] motion; insufficient evidence supports the increased risk of harm element of kidnapping for robbery; and trial counsel was ineffective in failing to move for an acquittal on the kidnapping for robbery charge and failing to urge the jury to acquit for failure of proof on that charge. Appellant further contends his trial counsel was ineffective in five additional areas: 1) failing to investigate and present evidence victim Chang was a scammer who had embezzled large sums of money and had a motive to falsely accuse appellant of kidnapping; 2) failing to investigate and present evidence that appellant had a character for honesty and non-violence; 3) failing to request a continuance of the trial to conduct a videotaped examination of Chang in China; 4) failing to object to Deputy Brandon Seung's repetition of virtually everything Chang said to him, and 5) failing to object to the deputy's vouching for Chang's honesty. Appellant contends that even if no one instance of ineffective assistance is prejudicial, the cumulative effect of those deficiencies is prejudicial.

---

[1]     All further unspecified statutory references are to the Penal Code.

[2]     *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

We find multiple errors in the trial court's ruling that appellant did not make a prima facie case of discrimination in his *Batson/Wheeler* motion. We find such a showing was made and we conditionally remand for further proceedings on that motion. We otherwise affirm the judgment of conviction in all respects.

## BACKGROUND

The kidnapping and criminal threats in this case began at the Tea Station restaurant in Walnut, California, on November 17, 2017. Victim Dong Dong Chang had arranged to meet his business associate Ms. Xin Ping Yu at the Tea Station to refund money related to their common education consulting enterprise. Chang brought two friends with him: Chao Ping Chen and Runtao Deng. Yu brought appellant, co-defendant Lingyon Xia, and two unidentified men with her.

After Chang produced one or more post-dated checks, Yu took the checks and left. Appellant and his companions commanded Chang to accompany them in a minivan to an area bank where Chang was expected to withdraw cash and give it to the men as part of the owed refund. Chang was not successful in obtaining cash at the first bank or at a second bank in the same plaza. The group then drove to a Citibank where Chang sought assistance from a bank representative, telling her he was withdrawing cash under duress from the men accompanying him. The bank representative called 911 and Los Angeles County Sheriff's Department (LASD) deputies came to the bank and arrested appellant. Appellant's companion co-defendant Xia was arrested the next day.

At trial, much of the evidence concerning the kidnapping came in the form of Chang's preliminary hearing testimony. Chang, a Chinese citizen, returned to China after the incident.

3

He briefly came back to the United States to testify at the preliminary hearing and then returned to China. Chang was expected to return to California to testify at trial, but did not do so for health reasons.

Chang's two friends, Chen and Deng, were prosecution witnesses at trial but did not recall much about the day's events. Specifically, they did not testify that they believed Chang had been kidnapped. They openly followed Chang to the three banks in their own vehicle and had their cell phones available at all times.

Chang's business associate Yu, to whom he gave the checks, also returned to China after the arrests and did not testify at the preliminary hearing or at trial. The two unidentified men who accompanied Yu, appellant, and co-defendant Xia to the Tea Station restaurant did not testify at trial.

In his preliminary hearing testimony, Chang explained that the Tea Station restaurant meeting was arranged at Yu's request. According to Chang, Yu introduced him to students who wanted to study in the U.S. Chang collected documents from the students. He gave the documents to appellant and co-defendant Xia who provided application and other miscellaneous services. Yu also collected money from the students and gave it to Chang, who in turn gave the money to appellant and Xia. Chang described himself as a middleman. Yu wanted Chang to refund the down payments made by some students who were unhappy with the business.

Chang brought checks totaling $50,000 to the meeting. He also brought a release form he wanted Yu to sign stating that he had refunded all outstanding money and had no more

4

responsibilities for the students. Chang no longer wished to be in business with Yu and appellant; he found it too stressful. According to Chang, after Yu got to know appellant and Xia, "they wanted to kick me out. And [Yu] disclosed a lot of the things of my company to them."[3]

Chang asked Chen and Deng to accompany him to the meeting because Yu's family had called his mother in China and threatened to make trouble for her at work if the money were not repaid. Yu also had Chinese police investigate his mother.

Chang, who showed up at the meeting with two friends, expected Yu to come to the meeting alone, but she arrived with appellant, co-defendant Xia, and two unknown men. Chang was nervous due to the prior threats by Yu and to a previous incident when appellant had punched Chang and impliedly threatened him by saying he knew where Chang lived.

---

[3] On cross-examination, Chang acknowledged that he owned a business in the education industry named California International Education, but he stated he "did not conduct any business in [the] name of the company" with Yu, appellant, and Xia. He denied that Yu, appellant, or Xia had invested in his business. He insisted he did not have a substantive business providing educational consulting but was only a middleman. Subsequent post-trial proceedings provide a complicated account of Chang's business activities and of his business relationships with Yu, appellant, and co-defendant Xia. In the pending habeas proceedings, students provided declarations showing Chang in fact had his own business working directly with students on their applications. In her declaration in support of the first new trial motion, Yu stated that she was originally Chang's client, invested in his business, and referred students to him in exchange for a referral fee. Yu also participated in the business arrangement with appellant and Xia described in Chang's testimony.

According to Chang, Yu and her companions surrounded him and his friends. Appellant asked Chang if he had the check. Chang testified he took out a check and the release agreement and gave the check to Chen. Chen gave the check to Yu, who walked away.[4]

Chang testified appellant then took a bullet out of his pocket, showed it to Chang, and said he wanted Chang to walk with him to another location. Chang did not want to go. Two men were holding his clothing and telling him to go, but Chang said he was not going. Chang's friends asked what was going on, and appellant replied that Chang had "ruined" him and he wanted $300,000 plus a unit of property from Chang. Appellant wanted Chang to produce $100,000 that day.

Chang tried to call his mother in China but she did not answer. Appellant then took Chang's cell phone and he and another person "forcefully" took and pulled Chang away. Appellant and one of the men told Chang he had to go to the bank. Chang asked if he could drive himself or go in his friend's car, but they said no. Appellant and the two men then "dragged" Chang to a gray minivan.

Inside the van, appellant asked Chang what bank to go to. Chang said the China Trust Bank in Rowland Heights. Chang testified that while the van was on the freeway, appellant pulled out a knife and said: " 'How much does a finger of yours worth?' And he started waving that knife to threaten me."

---

[4] Chang testified on cross-examination that it was three checks totaling $50,000. Bank records produced at appellant's second motion for a new trial suggest Chang gave Yu three post-dated checks totaling $50,000. The checks all subsequently bounced.

At the bank, appellant and Xia went inside with Chang and stayed behind him, "watching over my shoulders." The men stayed in the doorway in case Chang fled. There was no money in the account. Chang testified that the "check I put down the date of that very day . . . the money had already been withdrawn at the time."[5]

Appellant was very angry and threatened to take Chang away if he did not produce the money. Chang was not clear what that meant, but he suggested that he try to use his card at the Citibank next door to obtain money. The bank told him there was an issue with the card and they could not give him any money.

The men escorted Chang back to the minivan. Appellant asked if Chang could get money from his house. Chang suggested that he try the Citibank in Rowland Heights on Colima Road. Appellant told Chang that if he did not get money that day, there was nothing appellant could do to ensure Chang's safety.

Appellant escorted Chang to the bank and watched him from the doorway. According to Chang, he had a panic attack and a representative from the bank noticed this and asked him what was going on. Chang replied that he needed to get some money. The representative asked him what he was going to do with it. Chang testified: "So I told them that they forced me to go in the car and they been asking me for money. And they kept threatening me. [¶] I told the person from the bank please, please get me the money so I can give it to them."

---

[5] Documents at the second new trial motion show this was not true.

7

The representative told Chang to have a seat while he called Citibank's backup service. The representative kept telling Chang it was fine. Chang looked outside, saw police cars, and fainted.

On cross-examination, Chang clarified that co-defendant Xia followed the van in a black Mercedes Benz SUV. Chang's friends also followed the van in their own car. Chang acknowledged he did not tell anyone at the first two banks that he was being kidnapped and forced to get money. He claimed that at the first bank, appellant was keeping a close eye on him, so he tried to "hint" to bank personnel but they did not understand. Appellant was standing behind him, watching over his shoulder the whole time.

Appellant stayed with Chang when he went to the teller at the second bank. He was behind Chang and did not go outside. Chang also testified that appellant came with him inside the third bank, sat next to him, and did not leave until police arrived. Chang added: "He also came to me multiple times to ask me what is going on." He then reaffirmed that appellant sat next to him. Chang acknowledged he was familiar with "Julian," the Citibank representative who helped him during the kidnapping, from previous visits.

Jun Chu, the Citibank representative who helped Chang, testified at trial with a slightly different account of events. Chu testified he was near the door when Chang arrived. Chang came up to him and said, "You need to help me out." Chu asked him why, and Chang grabbed his arm and repeated, "You need to help me out." Chang had never touched Chu before. Chu could feel Chang shaking. He seemed "frantic." Chu guided Chang to a desk where they sat down. Chang was still shaking, and he kept

looking around constantly. Chang was emotional and Chu though he was scared.

According to Chu, Chang said: " 'I was brought to the bank. I need to take money out of the account.' " " 'There's people waiting outside and you need to help me out.' " Chu spoke with the bank manager, then moved Chang to a cubicle.

Chang indicated he was involved in a money argument with people with some kind of weapons who were waiting outside for him to withdraw money from his account and give it to them. Chang repeatedly asked Chu to call the police. Chu had another discussion with his bank manager, who told him to call the police. Chu called police from the cubicle with Chang sitting next to him. Chang seemed more scared during the phone call and kept saying that Chu needed to get help and help him out.

At some point after Chang told Chu there were men waiting for him outside, Chu looked up and saw three men circling the area on foot. One of them came inside the bank. Chu identified that man as appellant.

The prosecution showed Chu still photographs and surveillance video from the time in question. Chu identified appellant as the man in several photos entering and leaving the bank. He remembered that at one point appellant came close to the location where he and Chang were sitting, as was shown in one of the photographs. Chu also observed footage taken while he was in another area of the bank getting a directory to make calls. That footage showed appellant walking up to Chang in the cubicle and then walking away. Chu described it as appellant "checking on" Chang.

On cross-examination, Chu acknowledged that Chang calmed down while sitting in the cubicle, but then became frantic

9

and panicked during Chu's phone call with police, more so than he had been when he entered the bank. Chang did not faint until police arrived.

Chang's two companions at the Tea Station restaurant also testified at trial. Deng testified that he knew Chang through Chen. On November 17, 2017, Deng went with Chen to the Tea Station restaurant to have lunch. He did not expect anyone else, including Chang, to be there. At some point while Deng was eating his lunch, appellant showed up. At another point, Chang left. Deng then went driving with Chen.

Deng had previously given a more detailed statement to sheriff's deputies. He acknowledged telling them appellant showed up with four or five people, including Xia and a female. He also remembered telling deputies that Chang went into a vehicle and that he said he very afraid. He did not recall making other statements to the deputies. Deputy Seung later testified that Deng told him Xia had said to stay away from the Tea Station restaurant or his safety would not be guaranteed.

Chen and Deng followed the van in Deng's own car, a white BMW. They went to two banks. One was a Citibank. Deng agreed the surveillance video showed him going inside a Citibank. Deng explained that he wanted to use the restroom, but was not allowed to. He returned to his car and played with his cell phone while waiting for Chen. Police came and arrested him. On cross-examination, Deng agreed he did not see appellant threaten Chang, or show him a bullet or knives at the Tea Station restaurant. Deng was in possession of a cell phone that day until police arrested him.

Chen testified Deng was his roommate. Deng came with Chen to the Tea Station restaurant on November 17, 2017. Chen

10

went there to meet Chang for a meal.  Chang was going to give money to Yu.  When Yu arrived, she was accompanied by appellant and Xia.  Chen knew appellant and Xia.  There were also three other men whom Chen did not know.

Chang handed a check to Chen, who gave it to Yu.  Chen then walked over to the side of the Tea Station restaurant with co-defendant Xia and an unknown man.  They engaged in "ordinary chatting."  Chen did not recall telling deputies that Xia told him not to get involved.  Deputy Seung testified Chen said that Xia had told him he should not intervene because his safety could not be guaranteed.

At some point, Chen looked over and saw Chang and some others about to get into a gray Dodge van.  Chang told Chen to follow the van.  Appellant went in the van with Chang.  Xia followed behind Chen in a black Mercedes.  They all drove to a bank in Colima.  Appellant and Chang got out of the van and walked to the bank.  Chen and Deng followed on foot.  Chang looked nervous.  Chang came out of the first bank and walked to another bank in the same plaza.  Chen watched him but did not follow.

The group next went to a third bank, also a Citibank. Xia drove away.  Chang went inside.  Appellant and Chen also went inside for a little bit. Appellant was sitting for a short while.  When police arrived, Chen was detained.

Chen did not remember telling deputies he had messaged Chang's mother and told her to call the police.  He did not remember telling deputies the people with appellant were very scary and he was afraid of them.  He did not remember telling deputies that Chang was timid, but he agreed Chang was "indeed timid."

11

On cross-examination, Chen confirmed he was not afraid of appellant and Xia, and did not see appellant show Chang a bullet or knives, or force Chang into the van. Chen never called the police that day and there was nothing preventing him from doing so. Chen testified Chang said he owed money to appellant and Xia.

LASD deputies came to the bank in response to Chu's call. Appellant was arrested and two rounds of .45-caliber ammunition were recovered from his right front pants pocket.

LASD Deputy Seung was the handling deputy. He observed Chang on the floor of the bank and waited while fire department personnel attended to him. Deputy Seung then spoke with Chang while he was in the ambulance. Chang appeared nervous and was shaky and shivering. Deputy Seung decided to "pamper" him and "comfort" him. He held Chang, hugged him and assured him he would be there for him during the entire process. Deputy Seung did not speak Mandarin and so he used Chu as an interpreter.

Chang told Deputy Seung that appellant and three to six other individuals had kidnapped him from the Tea Station restaurant and forced him to go around to banks and withdraw money. Appellant said that he would chop off Chang's fingers and showed him two rounds of .45-caliber ammunition and said that he will kill Chang and his mother in China. Appellant showed him a knife wrapped with a white towel. After appellant threatened to cut off Chang's fingers, Chang decided to get into the van with appellant.

Chang stated co-defendant Xia told Chang's friends not to intervene or he could not guarantee their safety. Chang also stated appellant "forced" him to get into the van by showing him the two rounds of ammunition and threatening him. Chang was afraid and got into the van.

LASD Detective Derick Coleman testified about his efforts to obtain surveillance videos for the locations involved in the kidnapping. The detective obtained surveillance video from the first bank China Trust Bank. Chang and appellant are both visible on the video but are not together. Detective Coleman also saw two men who were later determined to be Chang's friends walk into the bank.

Detective Coleman was unable to obtain any video from the Citibank in the same plaza. The detective did obtain surveillance video from the third bank, also a Citibank.

Detective Coleman went to the Tea Station restaurant, but discovered the security cameras were inside the restaurant near the back. The detective believed the kidnapping took place at outside seating at the front of the restaurant. He attempted to locate outside surveillance video from other businesses which might have shown the front of the restaurant, but was unsuccessful. Detective Coleman acknowledged he viewed video from the restaurant but did not record or otherwise capture that video.

LASD Detective Lorena Gomez testified about her interviews with Chang at the Citibank and later. Chang was hysterical and screaming. She had Chang transported to the station. The detective attempted to speak with Chang a few hours later, but he was so agitated that she had difficulty understanding him.

13

Detective Gomez testified video was recovered from the Tea Station restaurant and booked into evidence. The video was played for the jury. The video showed only the inside of the restaurant. The detective could not make out the outside of the restaurant in the video.

Detective Gomez also testified about her investigation of the Dodge minivan used in the kidnapping. The van was impounded, and was searched in the Sheriff's impound yard. She found two knives wrapped in a white towel and a red cell phone. She did not order the van, the knives, or the separately recovered bullets to be fingerprinted or swabbed for DNA. She felt checking the van would be futile because it was a rental vehicle. She did order the black Mercedes fingerprinted and swabbed.

Detective Coleman spoke with Chang several times after the incident, but he was always very emotional and she had difficulty understanding him. She confirmed Chang told her that Yu gave him $80,000 from students which Chang held for several months while taking a vacation. When he returned, appellant and Xia wanted him out of the business. Detective Coleman did not show Chang the bullets or knives that were recovered.

The detective confirmed Yu was a suspect and had been arrested at one point, but the detective had no plans to arrest her on those same charges again.

The only defense evidence was a portion of Deputy Seung's recorded interview of Chang, which was played for the jury.

The jury convicted appellant and hung on the charges against co-defendant Xia, who was then retried and acquitted. Xia did not testify at his retrial and has not provided any declarations in any of appellant's post-trial proceedings.

14

The two unidentified men accompanying appellant and Xia submitted declarations in support of appellant's first motion for a new trial but not the pending habeas petition. Yu submitted declarations in support of appellant's first motion for a new trial and his pending petition for habeas corpus.

Appellant has subsequently provided two declarations in support of his pending habeas petition.

## DISCUSSION

I. *Batson/Wheeler* Motion

Appellant contends the trial court erred in denying his *Batson/Wheeler* motion and this error deprived him of his constitutional rights to due process and a representative jury.[6]

Though we typically "afford deference to a trial court's *Batson/Wheeler* rulings, we can only perform a meaningful review when the record contains evidence of solid value. Providing an adequate record may prove onerous . . . .

---

[6] Respondent contends the motion was made by Jamon Hicks, counsel for co-defendant Xia, and appellant waived this claim when his trial counsel, Dominique Westmoreland, failed to join that motion. We see no forfeiture. The record is clear that Hicks was the attorney responsible for the defense's joint peremptory challenges. The two defense attorneys conferred about the challenges, but Hicks spoke for the defense. In making the motion Hicks stated: "[W]e have two Asian clients that are being assisted by the Mandarin interpreter . . . we believe that there is an effort by the prosecution to remove the Asians from the panel." No formal statement of joinder was necessary, particularly since the record is clear that the trial court understood the motion as a joint one, stating in post-trial proceedings that "defense counsel, Mr. Hicks and Mr. Westmoreland, made their *Wheeler* motion."

15

Nevertheless, the obligation to avoid discrimination in jury selection is a pivotal one. It is the duty of courts and counsel to ensure the record is both accurate and adequately developed." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1172 (*Gutierrez*).)

As set out below, the trial court erred in failing to find a prima facie case of discrimination. Because the court did not reach the second and third steps of the *Batson/Wheeler* analysis, the record is not adequate to permit a complete meaningful review. We remand for further proceedings.

### A. General Law

A " 'prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds"—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 898; *Wheeler, supra,* 22 Cal.3d at pp. 276–277.) Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. (*Batson, supra,* 476 U.S. at p. 88; see also *People v. Cleveland* (2004) 32 Cal.4th 704, 732.) The Constitution forbids striking even a single prospective juror for a discriminatory purpose. (*Snyder v. Louisiana* (2008) 552 U.S. 472, 478.)

It is presumed that the prosecutor exercised peremptory challenges in a constitutional manner, and appellant bears the burden of rebutting that presumption. (*People v. Johnson* (2015) 61 Cal.4th 734, 755.) In determining whether the presumption of constitutionality is overcome, we apply the well-established three-step inquiry set forth in *Batson*. (*People v. Taylor* (2009)

16

47 Cal.4th 850, 885.)  The three-step procedure also applies to state constitutional claims.  (*People v. Bonilla* (2007) 41 Cal.4th 313, 341.)

At step one, "the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" (*Johnson v. California* (2005) 545 U.S. 162, 168.)  In ruling on the motion, if a trial court finds that the circumstances give rise to an inference of discrimination, a trial court may consider whether the record contains "readily apparent" and "obvious race-neutral grounds" for the prosecutor's use of a challenge to dispel that inference, but "the very purpose of *Batson*'s first step is to elicit the prosecution's actual reasons for exercising its strikes when other circumstances give rise to an inference of discrimination:  'The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process.  [Citation.]  The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question.'  (*Johnson v. California, supra*, 545 U.S. at p. 172.)" (*People v. Rhoades* (2019) 8 Cal.5th 393, 430–431 (*Rhoades*).)

Further, even when a trial court finds no inference of discrimination at the first step, it is the better practice for a trial court to ask the prosecutor to state her reasons for exercising the challenge.  As our Supreme Court has explained, although "a party exercising a strike . . . has no obligation to articulate a reason until an inference of discrimination has been raised [Citation]—we have nonetheless repeatedly encouraged trial courts to offer prosecutors the opportunity to state their reasons

17

so as to enable creation of an adequate record for an appellate court, should it disagree with the first-stage ruling, to determine whether any constitutional violation has been established." (*People v. Scott* (2015) 61 Cal.4th 363, 387–388 (*Scott*).)

"After all, when a trial court erroneously fails to discern an inference of discrimination and terminates the inquiry at that point, an appellate court is generally required to order a remand to allow the parties and the trial court to continue the three-step *Batson/Wheeler* inquiry. [Citation.] An investigation into the prosecutor's motives many years after the fact, when memories have faded and the parties' written notes can no longer be found, is an inferior substitute for a contemporaneous record of the prosecutor's justification and the defendant's response." (*Scott*, *supra*, 61 Cal.4th at p. 388.)

If the court finds the defendant has made a prima facie case giving rise to an inference of discrimination, the inquiry proceeds to the second step. At the second stage, the burden shifts to the prosecutor to give " 'a "clear and reasonably specific" explanation of his or her "legitimate reasons' for exercising the challenges." ' " (*Gutierrez, supra*, 2 Cal.5th at p. 1158.) The explanation must show a neutral basis for the challenge – not one based on race, ethnicity, or similar grounds. (*Ibid.*)

At the third step, if the opponent indeed tenders a neutral explanation, the trial court must decide whether the movant has proven purposeful discrimination. (*Johnson v. California, supra*, 545 U.S. at p. 168.) Here, the movant must show that it was more likely than not that the challenge was improperly motivated. (*People v Mai* (2013) 57 Cal.4th 986, 1059 (conc. opn. of Liu, J.).) This portion of the *Batson/Wheeler* inquiry "focuses on the subjective genuineness of the [prosecutor's] reason, not the

18

objective reasonableness.  [Citation.]  At this third step, the credibility of the explanation becomes pertinent."  (*Gutierrez*, *supra*, 2 Cal.5th at p. 1158.)

### B.     The Motion Proceedings

Voir dire commenced on September 24, 2018.  After the prosecutor exercised her third peremptory challenge of the morning on September 25, 2018, defense counsel made a *Batson/Wheeler* motion, stating:  "Yesterday, it is my recollection, that there were three peremptory challenges by the prosecution, one of which was Asian.  Today there's been three Asians that have been kicked."  Defense counsel continued:  "[W]e believe that there is an effort by the prosecution to remove the Asians from the panel.  [¶]  And, specifically, Your Honor, I reiterate, it's not just in the numbers but it's in the manner to kick three in a row."

The trial court immediately responded:  "So I'm going to go ahead and deny the motion.  [¶]  I find the motion to be without merit. . . .  I look at the last two jurors that were excused by the People, they were borderline for cause.  Either side could have probably challenged [them] for cause."  After discussing the specific reasons the court believed provided "borderline" cause, the court concluded by stating:  "So I think the prosecutor would be derelict in her duties if she didn't excuse those two.  So I don't see any pattern whatsoever."  The court than asked the prosecutor if she would like to add anything to the record, but she replied she "would submit at this point based on the court's comments."

As part of the second new trial motion before the trial court, appellant raised the issue of the trial court's silence on two of the four Asian-American jurors mentioned by defense counsel in the *Batson/Wheeler* motion. The trial court stated: "I think the estimate [defense counsel] gave at one point was four and it may have been a different estimate at another point. But I think four was the number. So he didn't identify the four which is his burden and so I went ahead and on my own to make the record clear and identified the two that were which I recognized to be Asians and made the record on those. [¶] If there were in fact two other Asian jurors, counsel had a chance before and after my remarks to identify those jurors by juror identification number. I cannot guess who counsel is referring to."[7]

Although defendants had the burden of showing discrimination, there is nothing in the trial court's ruling which would have alerted defense counsel that the trial court believed defense counsel had not sufficiently identified all four of the Asian-American jurors. A moving party's failure to initially identify a juror by his or her juror identification number is not in itself a reason to deny a *Batson-Wheeler* motion when the juror's identity is otherwise clear from the record. (*People v. Motton* (1985) 39 Cal.3d 596, 604.)

---

[7] It is not clear what the trial court means by its statement that defense counsel had "a chance" to identify those jurors by identification number. The court certainly did not invite further input from defense counsel at any point. At the end of its ruling, the trial court specifically asked the prosecutor if she had anything to add. The prosecutor replied, "I would submit at this point based on the court's comments." The court then responded: "Thank you, both. [¶] Let's go ahead and resume."

Here, defense counsel clearly stated that "Today there's been three Asians that have been kicked." Counsel described them as being kicked "three in a row." In fact, the prosecutor had only used three peremptory challenges that morning. The three challenges took place within minutes of each other. The prosecutor excused (Asian) Juror 7059, defense excused Juror 0450, the prosecutor excused (Asian) Juror 6042, defense counsel excused Juror 5703 and the prosecutor excused (Asian) Juror 3916. The entire process takes up two pages of the reporter's transcript. Defense counsel made their motion immediately after the prosecutor struck Juror 3916. Under the circumstances, defense counsel provided more than sufficient information to identify the three jurors struck by the prosecution on September 25, 2018. As later proceedings showed, the juror stricken by the prosecutor the previous day was (Asian) Juror 3680, who was readily identifiable as Asian by the prosecutor from her notes because he worked in Chinese-language media and his mother tongue was Mandarin.

The trial court immediately began discussing in some detail the last two excused jurors, and referred to one by his juror identification number (which had not been specified by defense counsel). If anything, this suggests that the trial court understood precisely which jurors defense counsel meant.

The trial court did not make any particular "record" showing that these two jurors (Jurors 6042 and 3916) were or were not Asian-American. Articulating the issue might have put defense counsel on notice that the court had concerns about

21

establishing the ethnic identity of the jurors.[8] The trial court gave absolutely no indication it believed that only two Asian-American jurors in all had been excused by the prosecutor. And although the People now contend on appeal that Juror 7059 was not Asian-American, the prosecutor did not dispute the juror's race in the trial court. In making the challenge, defense counsel had stated without contradiction that the prosecutor had excused four Asian-American jurors. Given that neither the court nor the People questioned whether any of the jurors were Asian, there was no reason at all for defense counsel to attempt to add "evidence" to the record to show that Juror 7059 was in fact Asian-American.

"It is the duty of courts and counsel to ensure the record is both accurate and adequately developed." (*Gutierrez, supra,* 2 Cal.5th at p. 1172.) Here, there is no question that the trial court was simply incorrect in its unstated belief that that the prosecutor had only excused two Asian-American jurors. Had the court simply expressed this belief, the parties could have explained then, as the prosecutor did in post-trial proceedings, that Juror 3680, the juror excused the day before on September 24, 2018, spoke Mandarin as his first language and so was undoubtedly Asian-American.[9] Defense counsel also would have

---

[8] Although the court referred to Juror 3916's "language issues" the court never specified what the juror's first language was.

[9] When, in connection with the new trial motion, the trial court finally expressed its belief that only two Asian-American jurors had been excused, the prosecutor provided details of this third juror who was clearly Asian-American based on the fact that he spoke Mandarin as his first language.

had the opportunity to explain why they believed Juror 7059 was Asian-American. We would have an accurate and fully developed record for review. Due to the trial court's rush to judgment, we do not have additional evidence. We proceed, as did the parties and the trial court, on the presumption that all four challenged jurors were Asian-Americans.[10]

### C. Step One – Prima Facie Showing

"Although the question at the first stage concerning the existence of a prima facie case depends on consideration of the entire record of voir dire as of the time the motion was made [citation], we have observed that certain types of evidence may prove particularly relevant. [Citation.] Among these are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong." (*Scott*, *supra*, 61 Cal.4th at p. 384.)

"[A]n inference of discrimination rises or falls based on the circumstances in the record." (*Scott*, *supra*, 61 Cal.4th at p. 390.) Considering the "particularly relevant" factors on the record before us we find the facts support a prima facie case giving rise to an inference of discrimination.

Both defendants are Asian, the same race as the identified minority group.

---

[10] In light of our ruling, appellant's Motion for Remand filed July 10, 2020 is denied as moot.

23

The record shows that there was one Asian-American left in the panel being questioned after the prosecutor excused the four Asian-American jurors who were the subject of the *Batson-Wheeler* motion.[11]

Thus, the prosecutor had stricken 80 percent (4/5) of the Asian-American prospective jurors seated for questioning.

The record also shows that the prosecutor used four out of its first six peremptory challenges against Asian-American jurors, that is 66 percent (4/6). The defense pointed out that the "overwhelming majority of the panel is not Asians," but did not provide any specific numbers. The court and counsel did not dispute this assertion or provide any specific numbers.

As our Supreme Court has done, we "take notice of the census data here in recognition of the possibility that the lack of on-the-record comment simply reflects that the pool's composition was apparent to court and counsel at the time." Asian-Americans comprised slightly less than 14 percent of the population of Los Angeles County in 2010.[12] "Given the demographic makeup of the community from which the jurors were drawn, unless [Asian-Americans] were greatly overrepresented in the venire or received hardship and cause excusals at much lower rates than others, it is likely that they comprised substantially less than 50 percent of the pool." (*Rhoades*, *supra*, 8 Cal.5th at pp. 429–430.) Thus, the prosecutor's use of her peremptories was disproportionate.

---

[11] The trial court actually stated that there were two Asian jurors: Juror 3319 and Juror 4442. This is incorrect. Juror 4442 was called after the denial of the motion.

[12] <http://censusviewer.com/county/CA/Los%20Angeles> [as of May 5, 2021], archived at <https://perma.cc/UBW3-AEBV>.

24

The prosecutor does not appear to have asked any questions of Juror 6042. She asked only a few questions of Juror 7059 and only after the juror raised a hand in response to a general question addressed to the venire as a whole. The prosecutor did question Jurors 3916 and 3680 at more length. Thus, this is a mixed factor.

The only factor weighing against an inference is the fact that the victim is not the same race as the dominant group in the jury pool.

The inference created by these "particularly relevant" factors could have been dispelled if the trial court found race-neutral reasons in the record for the excusal. (*Rhoades, supra,* 8 Cal.5th at p. 431.) These reasons must be "apparent from and 'clearly established' in the record." (*Scott, supra*, 61 Cal.4th at p. 384.)

Such a reason is readily apparent and clearly established for Juror 3680, who described a negative experience with the Walnut sheriff's station personnel, the very station which is involved in this case. The same cannot be said for the other three jurors.

There was almost no questioning of Juror 7059, and the trial court did not discuss that juror in its ruling. Respondent suggests that the juror's affirmative answer to whether she or someone close to her had "ever been arrested for or accused of a crime" would provide a race-neutral reason for excusal. While arrest for a crime has been recognized as a race-neutral reason (*People v. Riccardi* (2012) 54 Cal.4th 758, 795), the juror's reply does not establish that she or a relative had ever been arrested. There were no follow-up questions of the juror and her answer could have involved someone being *accused* of a crime. That

accusation would not necessarily have been made by law enforcement.

Respondent also suggests that Juror 7059 showed an "apparent" distrust of police. The juror replied yes to a question asking if she thought a police officer could "maybe not tell the truth" on the stand. She then stated she did not think police officers were inherently untrustworthy and would evaluate their credibility on a "case-to-case" basis. This is an appropriate set of answers and not a reason to strike a juror. Jurors are expected to judge the credibility of all witnesses at trial, even police officers, based on factors relevant to each individual witness.[13]

There does not appear to be an obvious race-neutral reason for striking Juror 6042 that is supported by the record. The trial court stated that the "previous juror is the juror that went home and talked to her husband. While she did not talk to her husband about the facts of the case . . . , she is already violating my order by talking to her husband. And she now has developed language issues that she is using as a request to be excused from the jury after communicating quite a bit freely the last few days and not expressing that need."

---

[13]     Respondent describes the answers as equivocal and contends the prosecutor was not required to accept the juror's answers at face value. Oddly, respondent relies on cases where a prospective juror's exposure to gangs might have biased jurors despite the juror's insistence it would not. Respondent cites no experience of Juror 7059's which might have made her answers suspect.

The record does not show that Juror 6042 developed language difficulties overnight. On the first day of jury selection, Juror 6042 stated that she had difficulty understanding legal terms in English. On the second day of jury selection, the juror again expressed difficulty with legal terms, stating that "for daily life and my work [my English] is okay. But when we discuss about legal stuff, I'm not understand. For example, we discuss like the cookie story yesterday. I don't know what that mean[s]." The court replied that it was not sure it understood the cookie story either but "not everyone understands legal terms and we'll give definitions. But so far you've understood everything, is that right?" The juror replied that she had not understood some legal terms. Thus, the record shows that the juror expressed the same concerns about her English skills on both days.

The trial court's subjective belief that the juror was manifesting language difficulties for the purpose of being excused is not the sort of objectively race-neutral reason that is readily apparent from the record. We note that the trial court did not state that Juror 6042's English comprehension was itself a reason to excuse her. The juror did not express and the record does not show that she had difficulty with everyday English. As the trial court pointed out, legal terms would be defined.

The record also does not show that the trial court gave a general order or instruction to prospective jurors telling them not to discuss the case. It was not part of the trial court's initial remarks to the prospective jurors and the court did not admonish

27

the jurors not to discuss the case over lunch, during an afternoon break, or at the end of the day.[14]

While defense counsel and the court questioned the juror on her ability to refrain from discussing the case, they did not tell the panel it should refrain from discussions *before* being selected as a juror. When Juror 6042 stated that her husband was a lawyer and often spoke to her in legal terms, and she did not understand those legal terms, defense counsel asked: "Are you going to be able to not talk to your husband about this case *if you're a juror* in this case?" Juror 6042 responded: "I think that is a rule, right?" Hicks replied: "Yes. *If* the judge were to tell you that when you go home you can't speak to anybody about the case or the facts of this case, *say that you're a juror right now*, are you going to be able to do that?" After the prospective juror said that she would try her best, the court interjected: "It's a very simple court order, ma'am. So are you going to obey the court order or not? The rules of the game involve *when you're in trial* till you've concluded your activities you cannot talk to others about the case. So can you follow the order or not?" Juror 6042 replied: "Yes, I can." (Italics added.) Thus, both the court and defense counsel indicated that the no-discussion rule applied to

---

[14] The next day, the court stated: "But please be reminded as we discussed, there are some things we've asked folks to do and we've had this conversation before, but we need you not to discuss the case. And though we haven't started the case yet, it's very important you not discuss the case with your husband or anyone else." The court's comments suggest that the court believed that it had told jurors not to discuss the case, but the record contradicts that belief.

persons selected to be jurors and during the actual trial of the matter.

The People suggest Juror 6042 might also have been excused because she had close relatives who had been arrested or accused of a crime. There is no indication in the record that her relatives were arrested. She referred to her brother getting a "hit and run" and stated her sister "was shoplifting." Both incidents could involve accusations, in the brother's case by another driver and in the sister's case by store personnel, rather than arrests by law enforcement personnel. The People did not follow up to clarify.

We note that at the end of the People's discussion in their brief about arrests, the People suggest we should recognize that a trial court which interacts with a juror "gleans valuable information that simply does not appear on the record." (*People v. Stewart* (2004) 33 Cal.4th 425, 451.) We do not doubt this general principle, but in evaluating whether a prima facie case has been made or dispelled we are limited to facts established by the record. And it is the trial court's duty to make a clear record of pertinent facts.

We also take issue with the trial court's statements about Juror 3916. The trial court stated Juror 3916 "came this morning and said it was very, very hard for him to be here because of his medical issues that now have surfaced today. He clearly was making attempt aggressively by standing up and announcing these things that he didn't want to be here, and that is about a race neutral a reason as one can use to excuse a juror."

29

The trial court did not simply state that the juror's medical condition was a reason for excusing him. That would be a race-neutral reason. The trial court found that the juror, by standing up and aggressively announcing his medical condition, showed he did not want to be there, which is a race-neutral reason to excuse him. The court's comments suggest that it did not believe that the medical condition itself was sufficient to excuse the juror. This is the trial court's subjective opinion and is not the sort of race-neutral reason which is obvious or apparent from the record.

The juror clearly explained it was uncomfortable for him to sit. It is not clear whether he was trying to be excused or to be accommodated. We are reluctant to find that the juror was ill enough to be excused, given the court's apparent skepticism of the severity of his pain. We do not find the record developed enough to obviously establish he was exaggerating, particularly since the juror offered to show the court paperwork concerning his injury or the injury itself, but the court declined. The court told the juror: "The attorneys will take that into consideration. All right?"

In sum, we do not find race-neutral reasons for the challenges to the remaining three Asian-American jurors sufficient to dispel a prima facie inference of discrimination.

>    D.    Steps Two and Three: Inquiry of the Prosecutor and
>           Credibility Determination

Step two occurs after a prima facie case giving rise to an inference of discrimination has been shown. Step two calls for the prosecutor, not the trial court, to give race-neutral reasons for challenging jurors. (*Gutierrez, supra*, 2 Cal.5th at p. 1159 ["What courts should not do is substitute their own reasoning for the rationale given by the prosecutor, even if they can imagine a

valid reason that would not be shown to be pretextual."].)  If the prosecutor offers neutral explanations, the third step requires the trial court to decide whether the defendant has proven purposeful discrimination.  (*Id.* at p. 1158.)

Obtaining *actual* explanations from the prosecutor at these steps is critical because, as we noted above, "[t]his portion of the *Batson/Wheeler* inquiry focuses on the subjective genuineness of the reason, not the objective reasonableness.  [Citation.]  At this third step, the credibility of the explanation becomes pertinent.  To assess credibility, the court may consider ' " among other factors, the prosecutor's demeanor; . . . how reasonable, or how improbable, the explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy." ' [Citations.] To satisfy herself that an explanation is genuine, the presiding judge must make 'a sincere and reasoned attempt' to evaluate the prosecutor's justification, with consideration of the circumstances of the case known at the time, her knowledge of trial techniques, and her observations of the prosecutor's examination of panelists and exercise of for-cause and peremptory challenges."  (*Gutierrez, supra,* 2 Cal.5th at pp. 1158–1159.)

The prosecutor's actual, articulated reasons are also critical to our review of a trial court's determination at the third *Batson/Wheeler* step.  "We review the trial court's determination regarding the sufficiency of tendered justifications with ' "great restraint." ' " (*Gutierrez, supra,* 2 Cal.5th at p. 1159.)  We will affirm the ruling at this step if it is supported by substantial evidence.  (*Ibid.*)  But "[a] trial court's conclusions are entitled to deference only when the court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' " (*Ibid.*)

31

Here, the trial court offered its own reasons for the prosecutor's peremptory challenges. Because it appears the court was denying the *Batson/Wheeler* motion at the prima facie step, the court was allowed to identify some neutral explanation based on the record without first asking the prosecutor for the actual reasons at that stage. (See *People v. Lancaster* (2007) 41 Cal.4th 50, 75.) Once past the prima facie step, however, a " 'prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. . . . If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.' " (*Gutierrez, supra,* 2 Cal.5th at p. 1159.) The trial court never reached the second or third steps because it erroneously found appellant had not made a prima facie showing giving rise to an inference of discrimination. We decline to ascribe the trial court's reasons to the prosecutor. The appropriate remedy when the record is devoid of the prosecutor's articulated reasons for peremptory challenges is conditional remand for the trial court to address the second and third *Batson/Wheeler* steps: it should hear the prosecutor's reasons for the peremptory challenges and decide whether they are credible. (*People v. Johnson* (2006) 38 Cal.4th 1096, 1103–1104.) "If the court finds that, due to the passage of time or any other reason, it cannot adequately address the issues at this stage or make a reliable determination, or if it determines that the prosecutor exercised his peremptory challenges improperly, it should set the case for a new trial. If it finds the prosecutor exercised his peremptory challenges in a permissible fashion, it should reinstate the judgment." (*Id.* at p. 1104.)

32

To that end, we remand the motion to the trial court to conduct step two and, if necessary, step three of the *Batson/Wheeler* analysis. If the trial court finds on remand that the motion should be granted, it may then vacate the conviction and order a new trial.

II.     Increased Risk of Harm in the Kidnapping for Robbery

Appellant contends there is insufficient evidence that the asportation of Chang from the Tea Station restaurant, a public place of relative safety, to three area banks, places of even greater security, increased the risk of harm to Chang beyond that necessarily present in the robbery. He further contends his trial counsel was ineffective in failing to move for a judgment of acquittal on the ground of insufficient evidence of substantially increased harm and, separately, in failing to argue to the jury that it should acquit appellant on the ground of insufficient evidence of such harm.

Appellant was sentenced to life in prison for his kidnapping conviction. This sentence requires the jury to find that "the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§209, subd. (b)(2); see *People v. Daniels* (1969) 71 Cal.2d 1119, 1139.)

It is well settled that a "conviction for kidnapping will be affirmed if the method of transportation was so fraught with danger that it increased the risk of harm (*People v. Cleveland* (1972) 27 Cal.App.3d 820, 826 [104 Cal.Rptr. 161] (defendant's possession of weapons and threats of violence); *People v. Milan* (1973) 9 Cal.3d 185, 193 [107 Cal.Rptr. 68, 507 P.2d 956] (defendant's possession of a gun during automobile ride

33

accompanied by threats); *People v. Iverson* [(1972) 26 Cal.App.3d 598, 601] (defendant drove car with knife at victim's neck); *People v. Apo* (1972) 25 Cal.App.3d 790, 796 [102 Cal.Rptr. 242] (victim forcibly pushed and shoved, accompanied by threats))." (*In re Lokey* (1974) 41 Cal.App.3d 767, 771–772 [distinguishing *People v. Daniels*, *supra*, 71 Cal.2d 1119].)

" 'Clearly, any substantial asportation which involves forcible control of the robbery victim such as that occurring in this case exposes [him] to grave risks of harm to which [he] would not have been subject had the robbery occurred at the point of initial contact.' " (*People v. Lara* (1974) 12 Cal.3d 903, 908.) There is no requirement that a kidnapper keep a weapon trained on the victim for the entire time of the asportation. "The crucial inquiry under *Daniels* is whether a defendant, in the course of his asportation of the victim for purposes of robbery, has created a situation having a substantially increased potential for serious harm to the victim. Such a situation is clearly brought into being when, as in this case, the victim is forced to travel a substantial distance under the threat of imminent injury by a deadly weapon. The fact that the potential for serious injury inherent in such a situation is not actualized during the course of the asportation itself . . . is simply not relevant to the issue." (*Ibid*.)

Here, Chang testified that appellant showed him a knife and threatened to cut off a finger while both men were in the van on the freeway. Knives were later found in the van. This is sufficient evidence to support the jury's finding that the movement of Chang substantially increased the risk of harm to him over and above that necessarily present in the robbery itself.

Because there was sufficient evidence of a substantially increased risk of harm to Chang, trial counsel was not ineffective in failing to move for a judgment of acquittal on the ground of insufficient evidence of substantially increased harm or in failing to argue to the jury that it should acquit appellant on the ground of insufficient evidence of such harm.

III.    Ineffective Assistance of Counsel

Appellant contends that his counsel was ineffective in failing to investigate and present evidence of the victim's bad character and motive to lie and his own good character for honesty and non-violence; failing to request a continuance of the trial and apply to examine the victim in China; and failing to object to numerous aspects of Deputy Seung's testimony.

Appellant has the burden of proving ineffective assistance of counsel.  (*People v. Pope* (1979) 23 Cal.3d 412, 425.)  To establish such a claim, appellant must show his counsel's performance fell below an objective standard of reasonableness, and, but for counsel's error, a different result would have been reasonably probable.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Strickland v. Washington*, at p. 694.) " ' "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " ' [Citations.]"  (*People v. Thomas* (1992) 2 Cal.4th 489, 530–531.)

"When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

A.    Bad Character

Appellant contends trial counsel conducted no "independent investigation" of Chang and his embezzlement of student monies. He claims that evidence of such behavior would show Chang as a dishonest businessman who had a motive to lie and frame appellant for the kidnapping and robbery, because appellant's arrest would give him an opportunity to escape to China and from the consequences of his embezzlement. To show his counsel's failure to investigate, appellant points to three declarations submitted in support of his first new trial motion, by Yu, Lei Zhang, and Xiyuan Qui. The latter two men are the unidentified males who were at the Tea Station restaurant with Yu, appellant, and co-defendant Xia.

All three individuals faced criminal liability in this case. Even if trial counsel was deficient in attempting to locate or contact them, there is a high probability that Qui and Zhang would have declined to testify being advised of their rights. The trial court made it clear that it would have been required to appoint legal counsel for Zhang if he appeared. Qui, who stated that he rented the van and drove it from Arizona, refused to testify at the new trial proceedings on Fifth Amendment grounds.[15] Thus, appellant has not shown a more favorable

---

[15]    The exact basis for the assertion is not clear. In his declaration, Qui makes statements consistent with being in the

36

result would have been reasonably probable if counsel had located and spoked with Qui and Zhang before trial, and the portion of his claim based on counsel's specific failure to investigate these two men fails.

In his concurrent petition for writ of habeas corpus, appellant has made a prima facie showing that trial counsel undertook little or no pre-trial investigation or preparation. Although Yu was represented by counsel and indicated a willingness to testify, she was a suspect in this case and has returned to China. She has submitted a declaration in support of the petition for habeas corpus, and trial counsel's failure to investigate her availability and potential testimony are better determined in those proceedings, as is the impact of that testimony, if any.

B.   Good Character

Appellant contends his trial counsel conducted no investigation into his good character and thus never considered

---

van as Chang was driven from bank to bank, which would clearly make him a potential aider and abettor. He stated that Chang "told us to go to a Citibank" and then when he was unable to obtain money at that bank "insisted that we go to a third bank." However, at the new trial hearing, the prosecutor stated that Qui was not inside the van. The trial court asked defense counsel if that was correct, and defense counsel replied: "No, Your Honor." He added: "[T]he witness will testify that Dong Dong Chang consented to go with them and in the van." In denying the motion, the trial court nevertheless stated that Qui "wasn't there in the van at the time." Lending the van to appellant and Zhang could also give rise to criminal liability if Qui knew of and intended to assist their criminal purpose.

this line of defense. He points to letters prepared for sentencing from two friends and his parents as proof such evidence existed.

Appellant's defense was that Chang's account was an inherently unbelievable fantasy which the police failed to properly investigate. For example, defense counsel emphasized that Chang's friends followed along to all the banks and Chang entered the banks by himself, facts that proved the kidnapping claim was unbelievable. Appellant did not testify at trial. Thus, trial counsel might have made a tactical decision not to offer good character evidence for his non-testifying client. In order to be a reasonable tactical decision, however, it must be "an informed one . . . preceded by adequate investigation and preparation." (*In re Jones* (1996) 13 Cal.4th 552, 564–565.)

In his accompanying petition for writ of habeas corpus, appellant has made a prima facie showing that trial counsel was deficient in failing to hire an interpreter to communicate with him. Appellant has also made a prima facie showing that trial counsel undertook little or no pre-trial investigation or preparation. Among the potential strategic choices impacted by the lack of an interpreter and an investigation is counsel's decision not to present any witnesses, including appellant or character witnesses for appellant. Trial counsel's possible deficiencies concerning good character evidence are thus more appropriately evaluated in that habeas proceeding.

C.      Continuance and Examination in China
Shortly before trial, the prosecutor filed a motion to admit Chang's preliminary hearing testimony, on the ground that Chang's health problems precluded him from returning from China for the trial. Appellant contends his trial counsel was ineffective in failing to move for a continuance and apply to

38

examine Chang in China pursuant to Evidence Code section 1349.

Nothing in the record suggests Chang would have been healthy enough to testify in any reasonable timeframe. Further, the procedure is entirely voluntary (see *People v. Salcido* (2008) 44 Cal.4th 93, 131) and appellant has not shown that Chang would have agreed to such a procedure. Thus, appellant has not shown that competent counsel could have succeeded in examining Chang in China, and thus has not shown that a more favorable result would have been reasonably probable if trial counsel had sought a continuance to conduct an examination of Chang.

### D.   Deputy Seung

Appellant contends his trial counsel was ineffective in failing to object to Deputy Seung's testimony about Chang's statements to him at the bank. Appellant contends this testimony was not admissible because it consisted of prior consistent statements of Chang.

Appellant has forfeited this claim by failing to identify the specific testimony which amounted to prior consistent statements. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246; Cal. Rules of Court, rule 8.204(a)(1)(C).) The first third of the nine pages cited by appellant contain Deputy Seung's description of Chang's emotional state, which was based on the deputy's own observations of Chang. Then, not all of the statements in the following pages are consistent with Chang's actual testimony. For example, Deputy Seung testified that Chang stated appellant showed him two bullets. Chang testified to being shown only "a bullet."

Further, even assuming some of the repeated statements were consistent, defense counsel might have made a reasonable

39

tactical decision not to object because the uninterrupted testimony of Deputy Seung would give the jury confidence that they had heard the totality of Chang's statement to Deputy Seung about being "forced" into the van. That statement did not contain any hint that appellant touched Chang or physically forced Chang into the van. Specifically, Deputy Seung testified Chang stated "He was forced to get into the van." When asked if Chang told him how he was forced, Deputy Seung replied that "Yang displayed two rounds of ammunition and told Mr. Chang that " 'what this round could do to you' and Mr. Chang was scared. He agreed to go into the van."

At the preliminary hearing, Chang gave a much different account of events surrounding the bullet(s) display and added a claim appellant "and another two people dragged me to a gray minivan." Such inconsistencies between Deputy Seung's statements and Chang's actual testimony had the potential to call into doubt Chang's version of events.

Appellant also contends his counsel was ineffective in failing to object to Deputy Seung vouching for Chang's credibility during the following exchange. Deputy Seung: "I've gathered . . . everything that I need I gathered and that was the completion of my interview, and that's why I walked out." The prosecutor: "Anything about your [*sic*] demeanor at that point suggests that you felt Mr. Chang was lying to you?" Deputy Seung: "He was not lying to me."

This exchange occurred during what was essentially the defense case. The defense had elected to play a portion of Deputy Seung's videotaped interview of Chang. While the record does not reveal precisely which portion(s) of the videotape were played for the jury, defense questioning suggests one purpose of playing

40

the tape was to highlight expressions of disbelief by Deputy Seung.

Defense counsel's questions indicate Deputy Seung told Chang at one point to calm down or "I'm not going to believe you anymore." At the end of the tape, Deputy Seung said "We're done. I'm out of here" and "Please tell me the truth" and "I need you to be truthful." It appears that this portion of the interview concerned Chang's business relationships with Yu, appellant, and co-defendant Xia. At least one question asked by Deputy Seung suggested that he had doubts about Chang's veracity at that point. Deputy Seung asked Chang why he would have $50,000 in checks with him if he did not owe anyone money.

Defense counsel tried to get Deputy Seung to acknowledge that he did not believe Chang and that he ended the interview for that reason. Deputy Seung maintained that he did believe Chang, and Deputy Seung's statements were an interview technique. Since defense counsel had questioned Deputy Seung on his view of Chang's credibility, the prosecutor was entitled to ask questions on this topic on redirect. Further, Deputy Seung's answer added little to his earlier responses to defense counsel on this topic. Thus, even assuming an objection would have been sustained, there is no reasonable probability that appellant would have received a more favorable outcome if Deputy Seung's answer had been stricken.

E.     Cumulative Prejudice

Appellant contends that even if no one instance of ineffective assistance was prejudicial, the cumulative impact was. There are reasonable tactical explanations for almost all of the claimed instances of ineffective assistance of counsel. We do not second guess reasonable tactical decisions in the harsh light of

41

hindsight (*People v. Jones* (2003) 29 Cal.4th 1229, 1254) or try to guess if a different tactical decision would have resulted in a more favorable outcome.  It makes no sense to view counsel's decisions cumulatively to assess prejudice.  Even if trial counsel should have interviewed Qui and Zhang before trial and applied to examine Chang in China, any prejudice from the lack of live testimony from Qui and Zhang or videotaped testimony from Chang is attributable to those witnesses acting in their own self-interest, not to counsel's failure to make timely efforts to secure that testimony.

## DISPOSITION

This matter is conditionally remanded for a hearing on appellant's *Batson/Wheeler* motion and further proceedings, if necessary.  The judgment is affirmed in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

BIGELOW, P. J.

GRIMES, J.

42